# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

|  |  |  |
|---|---|---|
| *IN RE* TRI-STATE WATER RIGHTS LITIGATION. | : | Civil Action<br>File No. 3:07-MD-1-PAM |
| SOUTHEASTERN FEDERAL POWER CUSTOMERS, INC., | : | Member No. 3:08-CV-640-PAM |
| Plaintiff | : |  |
| v. | : |  |
| PRESTON M. GEREN, III, in his official capacity as Secretary of the United States Army; | : |  |
| JOHN PAUL WOODLEY, JR., in his official capacity as Assistant Secretary of the United States Army; | : |  |
| LT. GEN. ROBERT L. VAN ANTWERP, JR., in his official capacity as the Chief of Engineers and Commanding General of the United States Army Corps of Engineers; | : |  |
| BRIG. GEN. JOSEPH SCHROEDEL, in his official capacity as the South Atlantic Division Commander of the United States Army Corps of Engineers; and | : |  |
| COL. BYRON G. JORNS, in his official capacity as the Mobile District Commander of the United States Army Corps of Engineers, | : |  |
| Defendants. | : |  |

## SOUTHEASTERN FEDERAL POWER
## CUSTOMERS, INC.'S AMENDED COMPLAINT FOR
## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

## INTRODUCTORY STATEMENT

1.      Hydroelectric generation at the Lake Sidney Lanier[1] is a valuable source of hydropower for members of the Southeastern Federal Power Customers, Inc.,[2] which purchase capacity and energy produced by the U.S. Army Corps of Engineers'[3] projects located in the Apalachicola-Chattahoochee-Flint[4] River Basin.  SeFPC members have paid over $128 million in costs for the construction, operation, and maintenance of the Buford Dam and Reservoir's hydropower purpose.   Yet, for twenty-two years, the SeFPC's members, through decisions, actions, failures, and omissions of the Corps, have been denied the full hydropower benefits that Congress intended the Buford Project to provide and for which SeFPC members have paid, and continue to pay, suffering approximately $66 million[5] in lost hydropower benefits since 1994.  Unless changes are made, the harm to the SeFPC will be ongoing and increasing.

2.      Withdrawal of water directly from Lake Lanier for municipal and industrial[6] water supply adversely affects the Congressionally authorized hydropower purpose of the Buford Dam and Reservoir.  Water supply from the reservoir was not an authorized purpose

---

[1] Hereinafter, "Lake Lanier," "Buford Dam and Reservoir," or "Buford Project."

[2] Hereinafter, "SeFPC."

[3] Hereinafter, "Corps" or "USACE."

[4] Hereinafter, "ACF."

[5] This figure, as reflected below in the table at paragraph 105, is likely to increase significantly once the figures contained in that table are updated to include data from the administrative record from 2003 to the present.

[6] Hereinafter, "M&I."

of the Buford Project, and none of the capital costs of the project were allocated to water supply users.  Rather, Congress anticipated that water would flow downstream as a result of a specified plan for operation of hydroelectric facilities.  No storage at the Buford Dam and Reservoir, or use of storage to support releases at rates greater than normal hydropower releases downstream, have ever been allocated to water supply.

3.     This action is for declaratory judgment and injunctive relief relating to decisions, actions, failures, and omissions of USACE officers, in their official capacities, as the officers, together with their predecessors, responsible for the Corps' activities in exercising authority over the impoundment, dam, and hydroelectric generating facilities at Lake Lanier, which is located in Gwinnett, Forsythe, Dawson, Lumpkin, and Hall Counties, Georgia, in the ACF River Basin.  The SeFPC seeks, among other relief, a declaration that: (a) the Congressionally authorized purposes of the Buford Dam and Reservoir are hydropower generation, flood control, and navigation; and (b) absent appropriate crediting to the Southeastern Federal Power Program for hydropower benefits forgone, hydropower customers are not paying the "lowest possible rates" for hydropower, as mandated by the Flood Control Act of 1944.[7]  The SeFPC also seeks a declaration that, absent appropriate crediting to the hydropower interests by way of credits to the Southeastern Federal Power Program, the Corps' actions at Lake Lanier are:  (a) not authorized by the applicable statutes, i.e., the Water Supply Act,[8] the FCA, and the National Environmental Policy Act;[9] (b) violate the Corps' guidelines under those statutes; (c) are improper under the decision of the U.S.

---

[7] 33 U.S.C. § 708; 16 U.S.C. § 825s (2000) (hereinafter, "FCA").

[8] 43 U.S.C. §§ 390b-390f (2000) (hereinafter, "WSA.").

[9] 42 U.S.C. § 4321 *et seq.* (2000) (hereinafter, "NEPA").

Court of Appeals for the District of Columbia Circuit[10] in *Southeastern Federal Power Customers, Inc. v. Geren*;[11] and (d) are unlawful.   The SeFPC seeks injunctive relief requiring the Corps to:  (a) charge the M&I users the highest of benefits forgone, revenues forgone, replacement costs, or the updated cost of storage, as provided in Corps guidelines; (b) develop and adhere to an administrative process, including public notice and comment, that:  (i) considers proposed reallocations of storage in the Buford Dam and Reservoir to M&I use; (ii) adopts a method of tracking withdrawals from storage for M&I use; (iii) accounts for related expenses incurred and revenues charged and received; and (iv) fully credits the hydropower purpose of all ACF River Basin projects; and (c) credit the Southeastern Federal Power Program, with interest, for hydropower benefits forgone or the costs of replacement power since 1994, which the Southeastern Power Administration[12] will pass through to the hydropower customers through its rates.[13]

4.     In addition, the SeFPC seeks a declaration that the Corps, beginning as early as 1973 and continuing at the present time, has been and is persistently violating NEPA by allowing water withdrawals for M&I purposes that are completely lacking the environmental scrutiny mandated by that statute and by applicable regulations and procedures promulgated pursuant to it.   The SeFPC requests that this Court direct the Corps to perform the required

---

[10] Hereinafter, "D.C. Circuit."

[11] 514 F.3d 1316 (D.C. Cir. 2008), *petition for cert. filed*, (U.S. Aug. 13, 2008) (No. 08-199). Hereinafter, "*SeFPC v. Geren*" or "D.C. Circuit Decision."

[12] Hereinafter, "SEPA."   SEPA is a separate organization within the Department of Energy.  *See* 43 U.S.C. § 485; 42 U.S.C. § 7152 (2000).

[13] Hereinafter, "crediting the hydropower purpose" or "crediting to the hydropower purpose."

NEPA analyses of its continuing course of permitting water withdrawals from Lake Lanier for M&I purposes.

## JURISDICTION AND VENUE

5.     This action arises under the WSA, FCA, and NEPA, along with the regulations and guidelines implementing those statutes.

6.     The SeFPC seeks judicial review pursuant to Chapter 7 of the Administrative Procedure Act.[14]

7.     The U.S. District Court for the District of Columbia[15] has original jurisdiction of this action, pursuant to 28 U.S.C. §§ 1331 and 1361; 5 U.S.C. §§ 701-706; 43 U.S.C. § 390b; 33 U.S.C. § 708; and 42 U.S.C. §§ 4321, *et seq.* (2000).

8.     Venue is proper in the D.C. District Court, where the case was originally filed, under 28 U.S.C. § 1391(e) (2000).

9.     On June 3, 2008, the Judicial Panel on Multidistrict Litigation[16] transferred this case to multidistrict litigation ongoing in the U.S. District Court for the Middle District of Florida, in *In re Tri-State Water Rights Litigation*, for coordinated or consolidated pretrial proceedings.[17]   The Panel found that the instant action "involves questions of fact that are

---

[14] 5 U.S.C. §§ 701-706 (2000).  Hereinafter, "APA".

[15] Hereinafter, "D.C. District Court."

[16] Hereinafter, "Panel."

[17] *In re Tri-State Water Rights Litig.*, MDL No. 1824 (J.P.M.L. June 3, 2008) (conditional transfer order).  The order was conditioned on opposition to the pending transfer.  No party filed an opposition, and the condition was lifted June 19, 2008.

common to the actions previously transferred to the Middle District of Florida and assigned to Judge [Paul A.] Magnuson."[18]

## **PARTIES**

10.     The SeFPC is a not-for-profit corporation duly organized and existing under the laws of the State of Georgia.  The purposes of the corporation are, among others, to protect and defend the federal power marketing program and the preference provisions of federal power marketing statutes, and to protect and defend its members' interests in the federal power marketing program in the Southeastern United States.  The corporation is comprised of twenty-one members, which represent not-for-profit rural electric cooperatives and municipal electric systems that operate in Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, and Kentucky.  In certain cases, it is the members of the SeFPC that purchase power directly from SEPA, which is the power marketing agency for the federal power marketing program in the Southeastern United States; in other cases, it is their member distribution systems that are the purchasers of federally generated hydropower.  The SeFPC members depend on timely water releases from the dams in the ACF River Basin, primarily the Buford Dam and Reservoir, to provide hydropower, especially at times of peak demand for electricity.  Thus, the SeFPC has a "direct, substantial and legally protectable interest" in the Corps' operations of the federal projects in the ACF River Basin, as has been recognized by the U.S. Court of Appeals for the Eleventh Circuit.[19]

---

[18] *Id.*

[19] *See Ga. v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1258 (11th Cir. 2002).

11.     Defendant Preston ("Pete") M. Geren, III,[20] the Secretary of the U.S. Army, has overall responsibility for the Corps, which in turn has responsibility for management of the Buford Dam and Reservoir and other similar hydroelectric generating facilities in the Southeastern United States and elsewhere in the country.

12.     Defendant John Paul Woodley, Jr., the Assistant Secretary of the Army for Civil Works, is directly responsible for the activities of the Corps, including those at the Buford Dam and Reservoir.

13.     Defendant Lieutenant General Robert L. Van Antwerp, Jr. is the Chief of Engineers and Commanding General of the Corps who oversees and directs the activities of the Corps, including those at the Buford Dam and Reservoir.

14.     Defendant Brigadier General Joseph Schroedel is the Corps' South Atlantic Division Commander who oversees and directs the activities of the Corps in that region, including those at the Buford Dam and Reservoir.

15.     Defendant Colonel Byron G. Jorns is the Corps' Mobile, Alabama District Commander who oversees and directs the activities of the Corps in that district, including those at the Buford Dam and Reservoir.

### RELATED PROCEEDINGS

16.     The instant action was initially resolved by a court-mediated settlement negotiated among the SeFPC, the Corps, the State of Georgia, and certain Georgia water supply providers (specifically, the Atlanta Regional Commission; Gwinnett County, Georgia;

---

[20] The SeFPC originally brought suit against Luis Caldera, *et al.* in their official capacities as officers of the U.S. Army and Corps.  Pursuant to Fed. R. Civ. P. 25(d), the SeFPC herein substitutes the current officers as parties.

and the City of Gainesville, Georgia).   The D.C. District Court approved the settlement agreement.[21]   The D.C. Circuit, however, vacated the settlement in *SeFPC v. Geren*, finding that the Corps needed Congressional approval before executing the agreement, because its implementation would have constituted a major operational change under the WSA.[22]   Upon learning of the D.C. Circuit's reversal of the D.C. District Court, the Panel *sua sponte* transferred this action to the multidistrict litigation proceedings in Florida.[23]

17.     Earlier, on March 20, 2007, the Panel transferred to the U.S. District Court for the Middle District of Florida four actions then pending in federal district courts in Alabama, Florida, and Georgia,[24] which are now being considered jointly.   These actions are generally referenced by the parties thereto as the *Alabama Case*,[25] the *Florida Case*,[26] *Georgia I*,[27] and *Georgia II*.[28]   The Panel found that "[c]ommon to all four actions remaining in district courts are questions concerning the conduct of the Corps *vis-à-vis* the flow of water in the [ACF] River Basin and/or the role of the [U.S. Fish & Wildlife Service,] which impacts the Corps' conduct," supporting centralization of the actions for pretrial purposes.[29]

---

[21] *See Se. Fed. Power Customers, Inc. v. Caldera*, 301 F. Supp. 2d 26, 35 (D.D.C. 2004), *rev'd, SeFPC v. Geren*.

[22] *See* the D.C. Circuit Decision at 1318, 1325.

[23] *See supra*, ¶ 9.

[24] *See In re Tri-State Water Rights Litig.*, 481 F. Supp. 2d 1351 (J.P.M.L. 2007).

[25] *State of Alabama v. U.S. Army Corps of Eng'rs, et al.*, Member No. 3:07-CV-249-PAM.

[26] *State of Florida v. U.S. Fish & Wildlife Serv., et al.*, Member No. 3:07-CV-250-PAM.

[27] *State of Georgia v. U.S. Army Corps of Eng'rs*, Member No. 3:07-CV-252-PAM.

[28] *State of Georgia v. U.S. Army Corps of Eng'rs, et al.*, Member No. 3:07-CV-251-PAM.

[29] *In re Tri-State Water Rights Litig.*, 481 F. Supp. 2d 1351 at 1352.

18.    Two related proceedings, referenced by the parties as the *CWW Case*[30] and the *Apalachicola Case*,[31] were subsequently brought in federal district court and also transferred to the multidistrict litigation.  These actions raise similar issues to the *Alabama Case* and *Georgia II*.

19.    Recognizing that SeFPC members "have a legally protectable interest in hydropower" because they "fall within the class of congressionally-designated preference customers" and "have paid most of [the] costs of the federal projects at issue" in the proceedings, Judge Magnuson granted the SeFPC's intervention as of right in all the pending actions in the multidistrict litigation.[32]

## BACKGROUND

20.    Congress authorized the following projects in the ACF River Basin for the production of hydropower:  the Buford Project; the West Point Power Project;[33] the Walter F. George Project on Lake Eufaula;[34] and the Jim Woodruff Dam on Lake Seminole.[35] Hydropower is generated at times corresponding to schedules prepared by SEPA using input provided by its customers, which include a number of the customers represented by the

---

[30] *City of Columbus, Georgia, et al. v. U.S. Army Corps of Eng'rs, et al.*, Member No. 3:07-CV-1033-PAM.

[31] *See City of Apalachicola, Florida v. U.S. Army Corps of Eng'rs, et al.*, Member No. 3:08-CV-233-PAM.

[32] *See In re Tri-State Water Rights Litig.*, No. 3:07-md-00001 (M.D. Fl. July 12, 2007) (order granting the SeFPC's intervention in the *Alabama Case*, *Florida Case*, *Georgia I*, and *Georgia II*); *see also In re Tri-State Water Rights Litig.*, No. 3:07-md-00001 (M.D. Fl. Jan. 15, 2008) (order granting intervention in the *CWW Case*); *In re Tri-State Water Rights Litig.*, No. 3:07-md-00001 (M.D. Fl. Apr. 24, 2008) (order granting intervention in the *Apalachicola Case*).

[33] Also known as West Point Lake.

[34] Also known as Lake Walter F. George.

[35] Other Congressionally authorized project purposes of the various federal projects in the ACF River Basin include flood control, navigation, recreation, and wildlife support.

SeFPC's members.  Some of these projects also have small turbines producing a small amount of off-peak power.  (Off-peak power is generally less valuable to the customers.) These projects together comprise the ACF System.[36]

21.    As the first and largest reservoir in the System by area and volume, operations at the Buford Dam and Reservoir are critical to integrated System operations.  As authorized, the purposes of the Buford Project are hydroelectric power production, flood control, and navigation.[37]  Based upon its location, the Buford Project, operating to provide hydropower, would incidentally stabilize the minimum downstream water flow as stored water from the Buford Reservoir first runs through turbines and then flows downstream.  This stabilized minimum flow would benefit navigation and provide a consistent water level downstream.[38]

**Operations at Lake Lanier**

22.    Congress authorized the Corps to develop, build, and operate the Buford Dam and Reservoir facilities in the River and Harbor Act, enacted July 24, 1946.[39]  The only Congressionally authorized purposes of the Buford Project are, again, hydropower, flood control, and navigation.  Congress authorized the Corps to construct the Buford Dam and

---

[36] Hereinafter, "System."

[37] River & Harbor Act, Pub. L. No. 79-14, §§ 1-2, 59 Stat. 10, at 10, 12, 17 (1945); River & Harbor Act, Pub. L. No. 79-525, § 1, 60 Stat. 634, at 634, 635 (1946).  The series of related projects along the ACF River System, including Buford, had a primary purpose of navigation; however, no specific navigation costs were attributed to Buford.  Rather, navigation was constructed in connection with other projects in the ACF System, such as Walter F. George, Columbia, and Jim Woodruff locks and dams.  Buford's hydroelectric operations contribute to river flow, and this flow is essential to navigation.  *See* Cost Allocation Studies Apalachicola, Chattahoochee, and Flint Rivers Project, Basis of All Allocations of Costs for Buford and Jim Woodruff Projects Adopted by the Chief of Engineers (1960) at 15, 17.  Hereinafter, "Cost Allocation Study."

[38] *See* S. Rep. No. 1508, 79th Cong., 2d Sess. at 23 (June 18, 1946); H.R. Rep. No. 2009, 79th Cong., 2d Sess. at 20 (May 13, 1946); 1946 Report of the Div. Eng'r to the Chief of Eng'rs, U.S. Army at ¶ 67, House Doc. No. 300, 80th Cong., 1st Sess. (1946) ("1946 Corps Report").

[39] River & Harbor Act, Pub. L. No. 79-525, § 1, 60 Stat. 634 (1946).

Reservoir based on the Corps' own studies and recommendations, including detailed cost-benefit analyses.  No storage from the Buford Project was ever allocated to water supply.

23.     The Buford Project formed the Lake Lanier Reservoir.  In a lake formed by a dam, the volume of the reservoir is called "storage" and is measured in acre-feet (i.e., the volume necessary to cover an acre of ground to a depth of one foot).  A substantial portion of the storage, known as "dead storage," cannot be used for hydropower production – dead storage supports hydropower "head" (i.e., the difference between the elevation of the lake and the center line of the turbine), but cannot be released through the turbine.  In Lake Lanier, there are three levels of storage:  (a) dead storage; (b) storage for the conservation or power pool; and (c) storage for flood control.[40]  Flood control storage is normally empty; its purpose is to remain available in case of substantial rainfall, when it fills to attenuate potential downstream flooding.  Of the total capacity of 2,554,000 acre feet in the Buford Reservoir, 1,049,000 acre-feet is allocated to power (between the top of conservation at elevation 1,070 Mean Sea Level[41] and the bottom of conservation at elevation 1,035 MSL), 637,000 acre-feet of storage is allocated to flood control, and the remaining 868,000 acre-feet is dead storage.[42]  Again, no storage was ever allocated to water supply.

24.     In order to operate as a peaking plant, water is stored in the conservation pool portion of the reservoir[43] up to elevation 1,071 MSL during the summer season and 1,070 MSL during the remainder of the year.  Water from the reservoir should be released during

---

[40] *See* Cost Allocation Study at App. A, Table 1.

[41] Hereinafter, "MSL."

[42] *See* Cost Allocation Study at 7.

[43] There is additional, normally unfulfilled reservoir capacity set aside for holding water for flood control.

peak periods to flow first through the turbines and then downstream.  A small amount of water, 600 cubic feet per second, is released through the reservoir's off-peak generating unit to provide minimum flows twenty-four hours a day.  If water is withdrawn directly from the reservoir, then less water would flow through the turbines and less energy would be produced.

25.     As mentioned, the Corps proposed and Congress authorized the Buford Project so that:  (a) two large turbines would generally operate during peak periods to maximize hydropower value; (b) the Buford Project would provide flood control benefits; and (c) the Buford Project would provide, through hydropower generation, increased downstream flow for navigation and to stabilize downstream water flow.  Downstream flow would be limited to that resulting from operation of two 40,000 kilowatts[44] generating units during periods of greatest demand for electricity and the single 6,000 KW unit for the generation of off-peak power.  Congress has never authorized removal of water from the Buford storage reservoir for M&I water supply by either Atlanta or by any other entity.[45]

26.     In addition to the natural process of evaporation, water may be withdrawn from a reservoir in two ways.  First, it can be withdrawn directly.  This process can be analogized to drawing water out of the reservoir through a straw, thus reducing the total amount of water in the reservoir.  Second, it can be released from the reservoir to flow downstream.

---

[44] Hereinafter, "KW."

[45] However, the Cities of Buford and Gainesville were permitted to withdraw water under rights in place (i.e., "grandfathered rights") before the construction of the dam.

27.     Direct withdrawals from a Corps reservoir are allowed where the entity withdrawing water has a legal right to storage.  Where an entity otherwise lacks a legal entitlement to storage, direct withdrawals can be accomplished legitimately by only one of two statutory means:  (a) storage may be reallocated pursuant to the WSA, if it does not seriously affect project purposes and does not involve major structural or operational changes;[46] or (b) surplus water may be sold pursuant to the FCA, as long as it does not adversely affect the lawful uses of the project.[47]

28.     Hydropower production capability is a function of not only the volume of water in storage ("energy") but also the elevation of the reservoir pool ("capacity").  The value of hydropower is made up of these two components:  energy and capacity.  Energy consists of the actual megawatt-hours produced.  Capacity is the amount of power on "stand-by" that could be called upon in the future to produce energy, and is marketed as a separate commodity by SEPA.  When water is withdrawn directly from the reservoir or released downstream for other than Congressionally authorized project purposes on a schedule that does not coincide with hydropower generation needs, SeFPC members are harmed because of the loss of energy or peak energy, respectively.  At the same time, any reduction in the pool elevation as a result of the release of water to meet other interests also creates a loss of hydropower capacity.  The capacity component has a higher value to the SeFPC than the energy component.  If capacity is lost, then an additional generation source must be secured by the SeFPC to meet the load requirements of its members.  This additional capacity would,

---

[46] *See* 43 U.S.C. § 390b(d) (2000).

[47] *See* 33 U.S.C. § 708 (2000).

more than likely, be a much more costly fossil-fuel resource, with capital investment in water and air quality equipment and other costs driving the price much higher than the existing hydropower resource.

### The Southeastern Federal Power Program

29.     The Corps is responsible for operating and maintaining federal hydropower generating facilities at federal multipurpose water projects.  The energy and capacity from the Buford Project, along with power from other federal projects in the Southeast, are marketed by SEPA to rural cooperatives, municipal electrical systems, a government corporation, and state agencies, in the States of Alabama, Georgia, Mississippi, Kentucky, North Carolina, South Carolina, Florida, Virginia, Tennessee, and Illinois in accordance with the federal power preference provisions of the FCA, which requires that "[p]reference in the sale of such power and energy shall be given to public bodies and cooperatives,"[48] such as the SeFPC's members.  Public bodies and not-for-profit electric cooperatives are given preference in the sale of electric power and energy generated at reservoirs under the control of the Department of the Army, and are therefore often referred to as "preference customers."[49]

30.     SEPA markets the output of the four project systems in the Southeast that are operated by the Corps to SeFPC members within specific marketing regions: the Georgia-Alabama-South Carolina[50] System; the Kerr-Philpott System; the Jim Woodruff System; and the Cumberland System.  SEPA provides an allocation of energy and capacity to each of its

---

[48] 16 U.S.C. § 825s (2000).

[49] *Id.*

[50] Hereinafter, "GA-AL-SC."

customers.  For some customers, the allocation may be as much as an estimated forty-eight percent of the capacity and thirty percent of the energy needs for that customer.  In some cases, SEPA sells power directly to the participating SeFPC members' distribution entities. For example, Coast Electric Power Association and Singing River Electric Power Association have direct allocations of power from SEPA; the remainder of their power supply needs are provided through their wholesale supplier, South Mississippi Electric Power Association, which is a member of the SeFPC that receives separate allocations of power from SEPA to serve a portion of the needs of the remainder of its member cooperatives.  In other cases, SeFPC members purchase power directly from SEPA.  For example, the PowerSouth Energy Cooperative[51] receives a direct allocation of power from SEPA.  In turn, PowerSouth acts as a scheduling entity and passes through the benefits of the hydropower to its individual distribution cooperative members.

31.    SEPA has contracted with each of its customers in the GA-AL-SC System to deliver a specific minimum amount of hydropower to the SeFPC members.  All of the SeFPC members and their customers that receive a SEPA allocation from the GA-AL-SC System receive capacity and energy from the Buford Dam and Reservoir.[52]  All of these SeFPC members rely upon the availability of the more economical hydropower from the Buford Project, and other Corps projects in the ACF River Basin, to meet a portion of their electricity needs.  Thus, when power is not available from the Corps reservoirs (i.e., if the

---

[51] Hereinafter, "PowerSouth."

[52] Attachment A hereto is a list of the customers who receive power from the GA-AL-SC System.  The projects in SEPA's GA-AL-SC System are as follows: Allatoona; Buford; Carters; J. Strom Thurmond; Walter F. George; Hartwell; Robert F. Henry; Miller's Ferry; West Point; and Richard B. Russell.  SEPA charges all of its customers cost-based rates pursuant to 16 U.S.C. § 825s (2000); *see also* U.S. Dep't of Energy, Order RA 6120.2 (Sept. 20, 1979).

contract minimum cannot be met), SEPA purchases replacement power from the market, at market prices, to meet the needs of these SeFPC members.  Some SEPA customers have also requested to buy their own replacement energy.

32.     The Corps, SEPA, and the SeFPC's members are interrelated with one another through the Southeastern Federal Power Program, which is separate and distinct from other Corps activities.  The Southeastern Federal Power Program is an enterprise of the federal government whereby the Corps, pursuant to Congressional authorization, builds and operates federal multipurpose water projects initially with federal funds and generates hydropower. Power marketing agencies within the U.S. Department of Energy market power produced at such facilities.  In the Southeastern United States, SEPA markets power that is generated at federal facilities operated by the Corps.   Most significantly, the customers of the Southeastern Federal Power Program, such as the SeFPC's members, pay the full costs of the program including repaying, with interest, the portion of the federal taxpayer investment in the Corps' multipurpose projects that relates to the hydroelectric purpose.[53]  Thus far, the hydropower customers have paid approximately $30 million in capital costs towards the $81 million allocated to the hydropower purpose for the Buford Project since the original construction,[54] leaving a remaining balance of approximately $51 million.  The rates SEPA charges to preference customers, such as the SeFPC's members, include the costs for operation and maintenance[55] and interest at these facilities related to the hydropower purpose.   These costs accruing to the hydropower component and paid by the SeFPC's

_____

[53] 16 U.S.C. § 825s (2000).

[54] As determined through 2007.

[55] Hereinafter, "O&M."

members have reached approximately $98 million.  In turn, the revenue from energy sales produces revenue for deposit into the Federal Treasury to reimburse Congressionally appropriated funds for capital and O&M and renewal and replacement[56] activities expenses at the Corps' hydropower facilities.[57]

33.     In recognition of the intended use of the project and based on the project's 1960 Post-Authorization Cost Allocation Study, the Corps allocated 86%, or $37.3 million, of the capital costs for the Buford Project to the hydropower customers (86% represents 100% of the hydropower capital costs and 82%, or $19 million of the joint capital costs for the Buford Project).  As a result of repayments, capital improvements, R&R, and revisions, the current costs allocated to hydropower at the Buford Project are 79.8%,[58] or $75.3 million, for plants-in-service (the increase over the original capital costs represents the costs of a major rehabilitation of the Buford Project and the allocation of related debt to hydropower). The hydropower customers have been paying, and continue to pay, for these costs in accordance with the Corps' allocated percentages, while the costs of navigation and flood control are borne by the federal government.

34.     The Corps is responsible for managing, operating, and administering the Buford Dam facilities subject to the requirements of the WSA, FCA, NEPA, and other federal statutes not directly involved in this action.  In connection with its duties under the

---

[56] Hereinafter, "R&R."

[57] 16 U.S.C. § 825s-2 (2000).

[58] 2005 SEPA Annual Report, at p. 10.

WSA and FCA, the Corps has memorialized its responsibilities in certain Engineering Regulations[59] governing the discharge of its responsibilities.

## STATUTORY AND REGULATORY FRAMEWORK

### Administrative Procedure Act

35.     The APA allows an injured party to request judicial review of federal agency actions or failures to act.  The APA specifically provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States[.][60]

36.     An injured party may seek review of a final agency action for which there is no other adequate remedy in a court or where there has been no declaratory order or any form of reconsideration:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.  A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.  Except as

---

[59] Hereinafter, "USACE ER."  These guidelines direct Corps actions under the related federal statutes. The Corps has not promulgated formal regulations (i.e., under the formal notice and comment process required by the APA) to carry out the provisions of the WSA or FCA.

[60] 5 U.S.C. § 702 (2000).

otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.[61]

37.    Under the APA:

The reviewing court shall –

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be –

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to [other] sections . . . of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.[62]

---

[61] 5 U.S.C. § 704 (2000).

[62] 5 U.S.C. § 706 (2000).

## Water Supply Act

38.     Under the WSA, the Corps' authority to effect reallocations is strictly confined to changes that do not seriously affect the authorized project purposes or involve major structural or operational changes.   In accordance with the WSA, Congressional authorization is mandatory if the proposed reallocation by the Corps would seriously affect the project's authorized purposes or involve major structural or operational changes.

39.     The WSA specifically states, in most relevant part:

> Modifications of a reservoir project heretofore [before July 3, 1958] authorized, surveyed, planned, or constructed to include storage as provided in subsection (b)[63] which would seriously affect the purposes for which the project was authorized, surveyed, planned, or constructed, or which would involve major structural or operational changes shall be made only upon the approval of Congress as now [on July 3, 1958] provided by law.[64]

40.     The Corps' guidelines for implementing its authority under the WSA provide that the Corps has the discretion to reallocate water storage space in existing reservoirs for M&I purposes only if certain circumstances are met and, in no case, if the proposed reallocation would seriously affect any of the project's authorized purposes or involve major structural or operational changes.   The Corps' own guidelines acknowledge the need for Congressional authorization in those circumstances:

> Reallocation or addition of storage that would seriously affect other authorized purposes or that would involve

---

[63] 43 U.S.C. § 390b(b) provides, in relevant part, that "storage may be included in any reservoir project surveyed, planned, constructed or to be planned, surveyed and/or constructed by the Corps of Engineers or the Bureau of Reclamation to impound water for present or anticipated future demand or need for municipal or industrial water[.]"

[64] 43 U.S.C. § 390b(d) (2000).

major structural or operational changes requires Congressional approval. Provided these criteria are not violated, 15 percent of the total storage capacity allocated to all authorized purposes or 50,000 acre feet,[65] whichever is less, may be allocated from storage authorized for other purposes.[66]

41.     Because of the size of Lake Lanier, the 50,000 acre-feet standard would be applicable, provided all other requirements are met, i.e., that the reallocation would not seriously affect other authorized project purposes or involve major structural or operational changes.

42.     The Corps has recognized that water supply reallocations require careful scrutiny and full justification.  In accordance with the agency's guidelines, all reallocations or additions of storage must be accompanied by a report that includes:

    a.     Purpose of the report and background, including map;

    b.     Pertinent project data table;

    c.     Water supply needs analysis;

    d.     Test of financial feasibility;

    e.     Cost of storage analysis;

    f.     Analysis of alternatives considered to address the water supply needs;

    g.     Appropriate National Environmental Policy Act documentation of environmental impacts;

---

[65] For water supply reallocations up to 499 acre-feet the Commander of the Corps delegated approval authority to the Division Commanders.  Water supply allocations that do not require Congressional approval and are the lesser of 15 percent or 50,000 acre-feet are to be made at the Commander's discretion.  USACE ER 1105-2-100, App. E, ¶ E-57d.(1) (Apr. 22, 2000).

[66] USACE ER 1105-2-100, ¶ 3-8b.(5) (Apr. 22, 2000).

h.     Pertinent letters from affected federal, state and local interests, including documentation of public review and comment.  Opportunities for public review and comment must be provided; and

i.     Commander's recommendation.[67]

43.     The Corps' above-referenced guideline directing the agency to provide for public review and comment implements the express statutory requirement with which the Secretary of the Army must comply if the Corps proposes an otherwise lawful reallocation of storage space:

> Before the Secretary may make any changes in the operation of any reservoir which will result in or require a reallocation of storage space in such reservoir or will significantly affect any project purpose, the Secretary shall provide for public review and comment.[68]

## Flood Control Act

### Surplus Water

44.     The Secretary of the Army is authorized by Section 6 of the FCA to enter into temporary water withdrawal contracts in order to allow water utilities to withdraw water immediately from surplus storage supplies.  However, the FCA expressly prohibits the Corps from entering into contractual arrangements that will adversely affect the project's authorized purposes.

45.     Section 6 of the FCA states that the Secretary of the Army is authorized to:

> [M]ake contracts with States, municipalities, private concerns, or individuals, at such prices and on such terms as he may deem reasonable, for domestic and

---

[67] USACE ER 1105-2-100, App. E, ¶ E-57d.(1) (Apr. 22, 2000).

[68] 33 U.S.C. § 2312 (2000).

> industrial uses for surplus water that may be available at any reservoir under the control of the [Department of the Army]: Provided, that no contracts for such water shall adversely affect then existing lawful uses of such water.[69]

46.     The Corps' guidelines implementing its authority under the FCA clarify the Corps' ability to enter into temporary contracts for the sale of surplus water.  The guidelines specifically provide that:

> Under Section 6 of the Flood Control Act of 1944, the Secretary of the Army is authorized to make agreements with states, municipalities, private concerns, or individuals for surplus water that may be available at any reservoir under the control of the Department.  These agreements may be for domestic, municipal, and industrial uses, but not for crop irrigation.  When the user desires long-term use, a permanent storage reallocation should be performed under the authority of the Water Supply Act of 1958, as amended.[70]

47.     Given the FCA's express statutory directive that the authorized project purposes are not to be adversely affected by surplus withdrawals, the definition of the term "surplus" is critical.  The term "surplus" is defined by the Corps' guidelines to mean either:

> (1)     water stored in a Department of the Army reservoir that is not required because the authorized use for the water never developed or the need was reduced by changes that occurred since authorization or construction; or
>
> (2)     water that would be more beneficially used as municipal or industrial water than for the authorized purposes and which, when withdrawn, would not significantly affect

---

[69] 33 U.S.C. § 708 (2000).

[70] USACE ER 1105-2-100, ¶ 3-8b.(4) (Apr. 22, 2000).

authorized purposes over some specific time period.[71]

48.    The U.S. Supreme Court has interpreted the meaning of the term "surplus" under the FCA.  In *ETSI Pipeline Project v. Missouri*,[72] the Court found the language of Section 6 of the FCA to be "plain enough:  'surplus water' is all water that can be made available from the reservoir without adversely affecting other lawful uses of the water."[73]

49.    As noted previously, the Corps' water withdrawal contracts may only have a short duration.  In its guidelines, the Corps has determined that these agreements will "normally [be] for five (5) years, with an option for a five (5) year extension, subject to the space being needed for the authorized purposes, or the authorized purpose is deauthorized."[74]

50.    The Corps' own guidelines recognize that "surplus water declarations citing use for higher beneficial purposes should be made with caution and only on a fixed period agreement for temporary use."[75]  In situations where a long-term use, instead of a temporary use, is required, a permanent storage reallocation should be performed under the authority of the WSA.[76]

51.    After the Corps has performed its initial determination that the surplus water withdrawal will not significantly affect authorized project purposes, the Corps is further required to prepare a report, similar to reallocation reports, that includes how and why

---

[71] USACE ER 1105-2-100, App. E, ¶ E-57b.(2)(a) (Apr. 22, 2000); *see also* USACE ER 1105-2-100, ¶ 3-8b.(4) (Apr. 22, 2000).

[72] 484 U.S. 495 (1988).

[73] *Id.* at 506.

[74] USACE ER 1105-2-100, ¶ 3-8b.(4) (Apr. 22, 2000).

[75] USACE ER 1105-2-100, App. E, ¶ E-57b.(2)(b) (Apr. 22, 2000).

[76] *Id.*

storage is determined to be surplus. This required report is to accompany the Corps' surplus water agreements.[77]

### Sales of Federal Hydropower

52.     Section 5 of the FCA mandates that federal hydropower should be offered for sale first to preference customers at the lowest possible rates consistent with sound business principles:

> Electric power and energy generated at reservoir projects under the control of the Department of the Army and in the opinion of the Secretary of the Army not required in the operation of such projects shall be delivered to the Secretary of Energy who shall transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles[.]
>
> .   .   .
>
> Preference in the sale of such power and energy shall be given to public bodies and cooperatives.[78]

53.     As applied to federally generated power, the preference clause "is, most simply, a recognition that publicly owned resources belong to the nation's people, and should be distributed directly to the people where it is possible to do so."[79]  The concept of "preference customers" arose out of a longstanding Congressional policy that hydropower generated by publicly financed, federal government-owned and operated facilities should be sold first to public bodies and not-for-profit cooperatives, such as the SeFPC's members, at

---

[77] USACE ER 1105-2-100 at App. E, ¶ E-57b.(3) (Apr. 22, 2000).

[78] 16 U.S.C. § 825s (2000).

[79] *Mun. Elec. Utils. Ass'n of N.Y. v. Power Auth. of the State of N.Y.,* 21 FERC ¶ 61,021, at p. 61,134 (1982), *modified on other grounds by* 23 FERC ¶ 61,302 (1983), *aff'd sub nom., Power Auth. of State of N.Y. v. FERC,* 743 F.2d 93 (2nd Cir. 1984).

the "lowest possible rates,"[80] to allow these entities to provide service to the retail consumers at the lowest possible costs.  The municipal and cooperative entities' ability to re-sell power at low rates would, in turn, act as a "yardstick," encouraging private utilities to reduce their rates to remain competitive, resulting in lower prices for all end-users.

### National Environmental Policy Act

54.     NEPA establishes a national policy pursuant to which the federal government, in this case acting through the Defendant officers of the U.S. Army and the Corps, must assess the environmental consequences of federal actions and consider alternatives thereto. These assessments include, where appropriate, determining the cumulative impacts of the contemplated actions; considering potential alternatives to contemplated actions; and developing mitigation measures.[81]

55.     To create a process to administer this statutory obligation, the Council on Environmental Quality,[82] an Executive Branch entity created by NEPA, adopted regulations prescribing the means of conducting required environmental analyses.  The CEQ NEPA regulations are binding on all federal agencies.

56.     In addition, the CEQ NEPA regulations require that each federal agency develop procedures to supplement the CEQ regulations.[83]  The Corps has adopted procedures to accomplish this purpose.[84]  Those procedures specifically provide that Corps actions, "which add additional purposes to a project," normally require that a full Environmental

---

[80] 16 U.S.C. § 825s (2000).

[81] 42 U.S.C. § 4332 (2000).

[82] Hereinafter, "CEQ."

[83] 40 C.F.R. § 1507.3 (2007).

[84] *See* 33 C.F.R. §§ 230.1 to 230.36 (2007).

Impact Statement[85] be prepared.[86]  Moreover, the Corps' NEPA procedures provide that, at a minimum, an Environmental Assessment[87] is normally required for any "changes in pool level operations."[88]

57.     Under NEPA and the CEQ NEPA regulations, federal agencies must determine whether to prepare an EA.  An EA must be prepared for actions that do not normally require an EIS.[89]  An EA must also be prepared whenever required under an agency's own NEPA regulations or procedures.[90]  Required elements of an EA include, without limitation, discussions of the need for the proposed action; the environmental impacts of the proposed action; and alternatives to the proposed action.[91]

58.     Under NEPA and the CEQ NEPA regulations, a full EIS must be prepared whenever a proposed action may have a significant impact on the environment.[92]  An EIS must also be prepared whenever required under an agency's own NEPA regulations or procedures.[93]  Specifically, NEPA regulations governing EISs include:

> a.      the requirement that related proposals affecting a "single course of action" shall be evaluated in a single EIS;[94]

---

[85] Hereinafter, "EIS."

[86] 33 C.F.R. § 230.6(b) (2007).

[87] Hereinafter, "EA."

[88] 33 C.F.R. § 230.7(d) (2007).

[89] 40 C.F.R. § 1501.4 (2007).

[90] 40 C.F.R. § 1501.3 (2007).

[91] 40 C.F.R. § 1508.9 (2007).

[92] 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.4, 1508.3, 1508.11, 1508.27 (2007).

[93] 40 C.F.R. §§ 1501.4, 1507.3 (2007).

[94] 40 C.F.R. § 1502.4 (2007).

b. the requirement that an EIS must address reasonably foreseeable cumulative impacts;[95]

c. the requirement that an EIS must address reasonably foreseeable indirect impacts;[96]

d. the requirement that an EIS adequately address environmental consequences; and[97]

e. the requirement that an EIS rigorously explore and objectively evaluate reasonable alternatives to a proposed federal action.[98]

### Corps Guidelines

### Pricing for Municipal & Industrial Water Users

59. According to the Corps' guidelines, the current federal policy on water supply recognizes that states and non-federal entities have the primary responsibility in the development and management of their water supplies. The policy further recognizes a significant but declining federal interest in the long-range management of water supplies and assigns the financial burden of supply to users.[99]

60. With regard to the permanent allocation of water storage under the WSA, the Corps' guidelines explicitly require M&I users to pay for water storage based upon the highest of four cost methodologies. The guidelines state:

> The cost allocated to the non-Federal sponsor (i.e., the price to be charged for capital investment for the reallocated storage) will normally be established as the highest of the benefits or revenues foregone, the

---

[95] 40 C.F.R. § 1508.25 (2007).

[96] *Id.*

[97] 40 C.F.R. § 1502.16 (2007).

[98] 40 C.F.R. § 1502.14 (2007).

[99] USACE ER 1105-2-100, App. E, ¶ E-52 (Apr. 22, 2000).

replacement cost, or the updated cost of storage in the Federal project.

(a) Benefits Foregone.  Benefits foregone are generally estimated using standard Corps NED economic evaluation criteria in compliance with the P&G.  For small reallocations from hydropower (i.e., within the Chief of Engineers discretionary authority), benefits may be based on current estimates of long term power rates.  These may be obtained from in house power value estimating procedures or otherwise in accordance with the P&G.  For large reallocations, estimates should be calculated in accordance with P&G procedures for evaluation of hydropower benefits.

(b) Revenues Foregone.  Revenues foregone to hydropower are the reduction in revenues accruing to the Treasury as a result of the reduction in hydropower outputs based on the existing rates charged by the power marketing agency. . . .

(c) Replacement Costs.

(1) If the reallocation is from flood control it is appropriate to utilize the replacement cost of equivalent protection.  This would not be appropriate for reallocations within the Corps discretionary authority which by definition do not have severe impacts.

(2) For reallocation from hydropower the replacement cost of power should normally be considered equal to the benefits foregone and calculated in accordance with P&G procedures for evaluating hydropower benefits. In cases where the power marketing agency has existing customer contracts, the replacement cost of power may be estimated as the agency's cost of obtaining power from the lowest cost alternative source for the duration of the contracts.  Once the contracts expire and for the remainder of the period of analysis the replacement cost of power should be equal to the benefits foregone. Documentation of the contracts and estimates of replacement costs of power to fulfill them should be included in the reallocation report.

(d) Updated Cost of Storage.  The costs to be reallocated to the water supply storage are determined by first computing the costs at the time of construction by subtracting the specific costs from the total construction cost and multiplying the result by the ratio of storage reallocated (ac-ft) to total usable storage space (ac-ft). . . .[100]

61.     The Corps' guidelines also state:

The non-Federal sponsor shall also be responsible for an appropriate share of the specific and joint-use operation, maintenance, replacement and major rehabilitation (OMR&R) costs.  In those cases where the cost of water supply is based on hydropower replacement costs, the OMR&R increment of such cost is to be deleted from the total charge and then billed separately based on a pro rata share of the actual experienced project costs.[101]

62.     Historically, cost allocations have been made to all authorized project purposes of a multipurpose Corps project.  For the hydropower customers, rates are set so that SEPA recovers all of the Corps' actual expenses of the portion of the project allocated to power, which actual expenses consist of:  (a) original investment allocated to hydropower plus additional, subsequent project capital costs; (b) interest on investment allocated to hydropower; and (c) O&M expenses allocated to the hydropower function, plus SEPA's full costs.

63.     Use of "benefits foregone" or "replacement cost" as a standard of payment for M&I water use establishes a link between the payment for M&I water and the benefits forgone by other project users, such as the power users.  This link is set forth, at least as to seasonal water use, in the Corps' guidelines, which require the water users to pay

---

[100] USACE ER 1105-2-100, App. E, ¶ E-57d.(2) (Apr. 22, 2000).

[101] USACE ER 1105-2-100, App. E, ¶ E-57d.(4) (Apr. 22, 2000).

"[c]ompensation to others for losses in their operation," which may be the same as benefits forgone.[102]

<u>Federal Crediting Mechanism</u>

64.     Under its guidelines, when the Corps allows water to be withdrawn directly from the reservoir or releases water downstream specifically for M&I purposes, the Corps should require storage contracts with the M&I water utility.  The revenue generated by these contracts should be credited against the outstanding repayment obligation, thereby offsetting expenses that are passed through to SEPA customers in their rates.  These credits are reflected in lower rates to customers.

65.     The Southeastern Federal Power Program allocates capital and O&M and R&R costs to each of the hydropower projects operated by the Corps.  It is the responsibility of SEPA to market the energy and capacity of these projects.  In the process of marketing the energy and capacity, SEPA contracts with its customers to deliver energy and capacity at established rates that reflect the full costs to make this power available.  In turn, the revenue generated by the rates paid by SEPA's customers is credited against the allocated costs.  The established rates are based on a certain quantity of energy and capacity being made available for the customer.  As a result of Corps decisions to divert water storage from the reservoir or provide releases downstream for water supply, the energy and capacity is diminished.  Replacement of this lost energy and capacity must be obtained from the market at much higher costs.   SEPA passes through to its customers the costs of this replacement hydropower.  If the Corps does not fully credit the hydropower purpose for the use of this

---

[102] USACE ER 1105-2-100, App. E, ¶ E-54a.(3)(d) (Apr. 22, 2000).

water, SEPA's customers continue to pick up the full costs of a diminished resource, while M&I water supply enjoys the benefit at a subsidized level equivalent to the replacement cost of power.

### LEGISLATIVE HISTORY OF THE CONGRESSIONALLY AUTHORIZED HYDROPOWER PURPOSE AT THE BUFORD DAM

66.     In addition to considering the statutory language to determine the Corps' duties and obligations under the law, courts also examine legislative history.  Normally, a court examines legislative history by reviewing reports by the U.S. House of Representatives, the U.S. Senate, and committees thereof.  For a Corps water resource project, however, a court must also determine Congressional intent through a review of the development process of a project, including the Corps' initial project analysis, the Corps' Definite Project Report, and Congressional appropriations during project construction.[103]  Review of these documents also reveals that water supply was not an authorized purpose of the Buford Reservoir, but an incidental benefit of the operation of the authorized project purpose of hydroelectric generation.

### The Corps' Initial Project Analysis for the Buford Project

67.     Congress authorized the Buford Project based on a report of the Chief of Engineers of May 13, 1946, which substantially adopted a March 20, 1946 recommendation of the Corps' Division Engineer.  The Corps determined that three proposed projects on the Chattahoochee River could not operate economically because of naturally low water flows; therefore, the Corps proposed construction of an upstream reservoir and dam at Buford,

---

[103] *U.S. ex rel. Chapman v. Fed. Power Comm'n*, 345 U.S. 153, 163-65 (1953).

Georgia.  The Corps noted that one advantage of locating the project at Buford was the

stabilized flow that it would provide at Atlanta:

> If the regulating storage reservoir required for the
> economical operation of the proposed developments
> below Columbus could be located above Atlanta, it
> would greatly increase the minimum flow in the river at
> Atlanta, thereby producing considerable incidental
> benefits by reinforcing and safeguarding the water
> supply of the metropolitan area.[104]

68.    As set forth in the 1946 Corps Report, these water supply benefits were only a

consequence of the downstream flow resulting from hydroelectric generation, and thus

incidental.

### The Corps' Definitive Project Report for the Buford Project

69.    As part of the process of developing the Buford Dam and Reservoir, the Corps

produced a Definitive Project Report, dated December 1, 1949.  That report stated that

primary benefits accruing to the Buford Project will be from hydropower generation and

flood control.  It also recognized that the Buford Project has only three purposes:  (a)

production of hydropower; (b) flood control; and (c) increased water flow.  This increased

downstream water flow, which results from operation of the hydroelectric project, as set forth

below, would, in turn, improve navigation.[105]  The report stated that the Buford Project

would have a total installed capacity of 86,000 KW, consisting of two 40,000 KW generating

units and one 6,000 KW generating unit.  The report further stated:  "The 6,000 KW unit will

---

[104] 1946 Corps Report at ¶ 68.

[105] USACE Definite Project Report: Buford Dam, Vol. I (Dec. 1, 1949).

release off-peak flows for municipal, industrial and sanitary purposes at Atlanta."[106]  And the

report also stated:

> It is expected that Buford will be operated as a peaking plant to provide the maximum possible power during the hours of greatest demand.  The primary function of the small unit is to provide flow to meet the municipal and industrial water requirements of Atlanta, and it will be operated mostly during off-peak periods when the large units are not operating; however, it will be operated in the peak when necessary for peak requirements.[107]

**The Congressional Appropriations Process for the Buford Project**

70.     Early in the appropriations process for the Buford Project, Congress requested

that the City of Atlanta, Georgia, contribute payments for the Buford Project because the city

would benefit from the reservoir.  In declining to contribute, then Mayor William Hartsfield

noted the many other sources of water available to Atlanta, and stated in response:

> In [Atlanta's] case, the benefit so far as water supply is only incidental and in case of a prolonged drought. . . . Certainly in view of other possible sources of Atlanta's future water we should not be asked to contribute to a dam which the Army Engineers have said is vitally necessary for navigation and flood control on the balance of the river.[108]

71.     Throughout the appropriations process for the Buford Project, the Corps

unequivocally explained that no storage was reserved for water supply, that water supply was

only an incidental project benefit, and that Congressional reauthorization would be required

if the project were ever to be used in the future for water supply.

---

[106] USACE Definite Project Report: Buford Dam, Vol. I, App. I at 1-1 (Dec. 1, 1949).

[107] *Id.* at 1-11.

[108] Letter from William Hartsfield, Mayor of the City of Atlanta, Ga., to James C. Davis, Congressman, U.S. House of Representatives (Mar. 1, 1948).

72.     In a hearing on the Buford Project, then Representative Gerald R. Ford, Jr., at the time a member of the Appropriations Subcommittee, asked Corps representative Colonel Potter why Atlanta does not pay project costs for Buford even though it benefits from the project.   Colonel Potter explained that this was because no storage was included in the project for water supply, and that water for Atlanta was only an incidental result of the project's operation for the project purposes of hydroelectric power production and flood control:

> This dam [Buford] furnishes Atlanta with water due to the fact that it regulates the discharges of floods.  When a flood comes, it comes down in a certain set period – say a week.  We store that week's terrific runoff of water and then let it out gradually[.]
>
> Then, in the production of electricity, we can discharge something in the neighborhood of 4,000 or 5,000 second-feet constantly.  This 4,000 or 5,000 second-feet is a rather large amount of water, and it will always be flowing by Atlanta; so that now they won't have the river partially dry or full of mud in the summer, but they will have a more or less constant flow of the river past their door and will always be able to pull water out of it.
>
> It did not cost the Federal Government 1 cent to supply that service, because it was an adjunct to the power supply and flood control.  Had we put in some storage purely for water supply, which they would tell us to release at certain intervals, we would then charge them for it, and they would have to pay for the difference of that construction costs.[109]

73.     There is a difference between, on the one hand, the incidental water benefit to Atlanta, which comes from the stabilized flows below the Buford Dam and which, in turn,

---

[109] Civil Functions, Dep't of the Army Appropriations for 1952, Hearings before the Subcommittee of the Committee on Appropriations, 82d Cong. First Sess. at 121-22 (1951).

come from hydropower generation, and, on the other hand, actually withdrawing water from the impoundment.  Water that is directly withdrawn from the reservoir is lost altogether to hydropower use.  In contrast, water that is permitted to flow through the turbines produces hydropower, and incidentally produces some benefits to Atlanta because of the stabilized flow.  Additionally, Congress contemplated that the downstream flows to Atlanta would result from on-peak operation of the two large units and off-peak operation of the smaller unit.  If water flows downstream from off-peak operation of the large units, the value of on-peak power is lost to hydropower customers.

74.     Later in that same hearing, Representative Ford asked about a hypothetical situation where water users would request more water from the Buford Project.  Colonel Potter explained that, in such a situation, the Corps would first determine whether water supply is more valuable than electricity.  If it so found, the Corps would be required to come back to Congress for project reauthorization for water supply.  The complete colloquy was as follows:

> Mr. Ford.  Is it not conceivable in the future, though, when this particular project is completed, that the City of Atlanta will make demands on the Corps of Engineers for certain water at certain times because of the needs of the community, when at the same time it will be for the best interests of the over-all picture – power, navigation, and flood control – to retain water in the reservoir?  Now, what is the attitude or what will be the attitude of the Corps of Engineers under those circumstances?

> Colonel Potter.  We have a case in point where a community is requesting that we make a water supply available to them out of a completed structure.  That water can be used and is being used to produce power;

therefore, it would have to be diverted to the water supply for this community.

The first thing we do is to decide, after a study, whether or not the water supply is more valuable to use for the production of electricity.  If it is, then we would have to come back, I believe, to Congress to alter the authorization of that project, were it a major diversion of water.

Mr. Ford.   When that particular project was authorized and funds were appropriated, was the water supply figured in the economic justification?

Colonel Potter.   It was not, because this particular little community has grown[.]

That study is not yet completed, Mr. Ford, but it is very important, and we take a very dim view of changing a project to the subsequent needs without Congress having a hand in it.[110]

75.      Similarly, in a 1954 Senate appropriations hearing, Colonel Whipple of the

Corps had this colloquy with Senator Allen Ellender (LA):

Senator Ellender.   When you say this will improve the water supply at Atlanta, it does not mean that Atlanta is going to participate in the payment of any of these improvements?

Colonel Whipple.  We understand not, sir, from the history of the authorization.  There are no additional costs for that reason.  It is purely an incidental benefit on account of the power releases which does not require any storage to be devoted to that purpose.[111]

---

[110] *Id.*

[111] Civil Functions, Dep't of the Army Appropriations, 1955, Hearings before the Subcommittee of the Committee on Appropriations, U.S. Senate, 83rd Cong., 2d Sess. on H.R. 8367 at 325 (1954).

76.     In   1953,   General   Claude   H.   Chorpening   discussed   with   Georgia Representative James C. Davis the issue of whether Atlanta should pay for a portion of the Buford Dam and Reservoir:

> Mr. Davis.  A great deal of benefit, perhaps not dollarwise, but practically speaking, results from assuring to Atlanta of a continuous and plentiful water supply.  To what extent is Atlanta, and the Atlanta community, contributing to the cost of this project? . . .
>
> General Chorpening.  While the city of Atlanta is not contributing to this, they get benefits from it, incidentally, as the result of the controlled release of floodwaters, and as the water is released through the powerplant[.]
>
> Mr. Davis.  Will the city of Atlanta be expected to pay for some of the water that will be made available to them as the result of this project?
>
> General Chorpening.  No; there would be no legal way to collect payment from the city of Atlanta, since, as was just stated, there is no additional cost being included for the construction of this project to provide the more uniform flow of water which will pass through the city of Atlanta.  In other words, the building of the project, with its power production and flood control and navigation benefits will not make available any more water that is now going past Atlanta.  It is only going to make it flow by at a more uniform rate.[112]

**The Corps Affirms Project Purposes**

77.     The Corps has also expressed its determination that water supply was only an incidental benefit, and not an authorized purpose, to State representatives.  In a 1955 letter responding to a Georgia request for water withdrawals from the Buford Dam for water

---

[112] Civil Function, Dep't of the Army Appropriations for 1954, Hearings before the Subcommittee of the Committee on Appropriations House of Representatives, 83rd Cong., 1st Sess. at 503 (1953).

supply, the Corps further affirmed that no storage for water supply was ever included in the Buford Project:

> Buford Dam was authorized and is now under construction to provide flood control, hydropower and flow regulation essential for navigation on the Apalachicola River. Storage in the reservoir has been allocated for these purposes, thereby leaving no surplus for water supply withdrawals above the dam. Any modification in allocation of storages will have an affect on the presently authorized purposes. For these reasons, it is believed that further Congressional authorization will be necessary before water withdrawals from the reservoir can be allowed.[113]

78.     The 1960 Corps Post-Authorization Cost Allocation Study for the ACF River Basin delineated hydropower, flood control, and navigation as the primary project purposes of Lake Lanier.  According to these studies, "[t]he primary benefits provided by the ACF project are flood control, navigation and hydroelectric power."[114]

79.     No portion of the capital costs of the Buford Project was ever allocated to water supply by the Corps.  Consequently, M&I users have not been allocated any portion of the capital costs associated with the Buford Dam and Reservoir since the project's inception.

80.     In determining whether implementation of a settlement agreement in this case would constitute a major operational change under the WSA, the D.C. Circuit determined that the appropriate baseline for measuring an allocation of storage to water supply is zero

---

[113] Letter from Lt. Col., Corps of Eng'rs to Chairman, Water Comm. Walnutgrove, Ga. (Oct. 25, 1955).

[114] Cost Allocation Study, at pp. 2, 5 (Oct. 27, 1960).

because this was "the amount allocated to storage space for water supply when the lake began operation."[115]

## FACTS GIVING RISE TO THE SeFPC'S CLAIMS

### History of the Corps' Contracts with
### Municipal Users for Water Storage Space at Buford

81.     Beginning in 1973, the Corps entered into a series of contracts with municipalities and other political subdivisions of the State of Georgia, enabling them to withdraw millions upon millions of gallons of water per day for M&I use from the conservation pool of the Buford Project facilities.

82.     Specifically, the Corps entered into contracts with Gwinnett County, Georgia – one in 1973, allowing for the withdrawal of forty-million gallons per day; and a second in 1988, that increased the permitted withdrawal total to fifty-three million gallons per day.  The Corps also entered into three contracts with the City of Cumming, Georgia – one in 1978, for withdrawal of two-and-one-half million gallons per day; a second in 1983, that increased the total to five-million gallons per day; and a third in 1988, that increased the total to ten-million gallons per day.   Similarly, in 1987, the Corps contracted with the City of Gainesville, Georgia, permitting the withdrawal of twenty-million gallons per day.[116]  These withdrawals alone total eighty-five million gallons per day, or 96,000 acre-feet per year.

83.     In addition to the withdrawals from the conservation pool of the Buford Project facilities described above, in 1986 the Corps entered into a contract with the Atlanta

---

[115] *SeFPC v. Geren*, 514 F.3d 1316 at 1324.

[116] This 1987 contract for the ability to withdraw twenty-million gallons per day included a "grandfathered right" from 1953 that allowed Gainesville to withdraw up to eight-million gallons per day.  The Corps has also accorded the City of Buford (in 1958) a "grandfathered right" to withdraw up to two-million gallons per day.

Regional Commission[117] that allowed the ARC to withdraw up to fifty-million gallons per day from the river flow produced by releases from Buford Dam.  This fifty-million-gallons-per-day commitment is in addition to the 327-million gallons per day that is normally available to the ARC by virtue of normal hydroelectric project operations (i.e., operation of the two larger generators on-peak and the smaller unit off-peak).  This additional fifty-million-gallons-per-day was made originally available primarily on weekends, requiring the diversion of valuable storage that would normally be used to generate hydropower during weekdays.

84.     Instead of entering into the contracts described above under the authority of the WSA or FCA, as mandated by those statutes and its guidelines, the Corps executed all of these contracts under the purported authority of the Independent Offices Appropriations Act of 1952,[118] which permits federal agencies to charge a fee for government services.  The Corps improperly characterized its contracts with the M&I users as service contracts under the IOAA because there had been no:  (a) allocation or reallocation of storage in the Buford Dam and Reservoir to M&I use that would permit contracts for the diversion of storage to M&I use under the WSA; or (b) surplus water declaration in the Buford Dam and Reservoir that would permit contracts for the diversion of surplus water under the FCA.

85.     By the end of calendar year 1993, all of the withdrawal contracts described above had expired.  The Corps in each instance, however, under the "live and let live" provision of the 1992 Memorandum of Agreement discussed below, permitted the

---

[117] Hereinafter, "ARC."

[118] 31 U.S.C. § 9701 (2001) (hereinafter, "IOAA").

withdrawals to continue, even without the otherwise required contracts in place, without interruption and in ever-increasing quantities.

86.     The quantity of withdrawals of water from Lake Lanier for M&I use has increased since 1973, as demonstrated by the following table:[119]

| Year | Total Quantity (Million Gallons Withdrawn) | Total Quantity (Acre-Ft to Support Withdrawals) |
|------|--------------------------------------------|--------------------------------------------------|
| 1973[120] | 2.44 | 2,801 |
| 1974 | 2.51 | 2,881 |
| 1975 | 2.44 | 2,801 |
| 1976 | 2.56 | 2,942 |
| 1977 | 10.34 | 11,872 |
| 1978 | 18.21 | 20,911 |
| 1979 | 19.82 | 22,751 |
| 1980 | 25.32 | 29,067 |
| 1981 | 26.99 | 30,988 |
| 1982 | 28.66 | 32,905 |
| 1983 | 31.83 | 36,538 |
| 1984 | 35.93 | 41,246 |
| 1985 | 40.94 | 46,999 |
| 1986[121] | 48.56 | 55,749 |
| 1987 | 51.21 | 58,788 |
| 1988 | 52.47 | 60,238 |
| 1989 | 50.47 | 57,938 |
| 1990 | 58.85 | 67,558 |
| 1991 | 57.83 | 66,392 |
| 1992 | 61.32 | 70,394 |
| 1993[122] | 68.88 | 79,071 |
| 1994 | 70.79 | 81,268 |

[119] Data provided in this table excludes "grandfathered" withdrawals.  The SeFPC does not challenge the "grandfathered" amounts.  Further, all data regarding Corps operations provided in this complaint is based on publicly available, un-audited information, and is subject to change after the administrative record is produced.  As a result, quantification of the SeFPC's harm as described herein may change, and the SeFPC reserves the right to update information regarding its harm upon receipt of the administrative record.

[120] The year that the Corps first entered into water storage contracts with M&I users (excluding grandfathered agreements with the Cities of Buford and Gainesville).

[121] For the first time, the Corps allocated to M&I users more than 50,000 acre-feet.

[122] By the end of 1993, all withdrawal contracts had expired.

| Year | Total Quantity (Million Gallons Withdrawn) | Total Quantity (Acre-Ft to Support Withdrawals) |
|---|---|---|
| 1995 | 80.37 | 92,266 |
| 1996 | 83.38 | 95,722 |
| 1997 | 84.86 | 97,415 |
| 1998 | 102.32 | 117,467 |
| 1999 | 111.42 | 127,905 |
| 2000[123] | 107.67 | 123,601 |
| 2001 | 108.43 | 124,480 |
| 2002[124] | 105.38 | 145,460 |
| **Totals:** | **1,552.20** | **1,806,414** |

87.     At present, the amount of water withdrawn still exceeds the amounts specified in the expired contracts.  As illustrated by the above chart, the Corps, beginning in 1986, allowed the use of storage exceeding its authority under the WSA and its internal guidelines that storage for water supply cannot exceed the minimum of 50,000 acre-feet or 15% of storage, provided that other WSA requirements are met.  By 1985, the Corps was aware that the storage to support withdrawals from Lake Lanier for M&I uses, if converted to water storage contracts, would exceed its discretionary authority as internally defined.  Because these withdrawals exceeded the five-year temporary period for surplus water and there was never any determination that surplus water existed in Lake Lanier, the Corps was required, under its own guidelines, to make the conversion to permanent water storage contracts. However, such conversion would have:  (a) seriously affected the Congressionally authorized purpose of hydropower of the Buford Project; and (b) constituted a major operational change.

---

[123] The SeFPC filed its original complaint in this action in December 2000.

[124] The SeFPC expects that the Corps will provide in its administrative record data that would permit the completion of this chart from 2003 to the present.

### The Corps Attempts to Address Increasing
### Water Withdrawals and Expired Contracts

88.      In October 1989, the Mobile District of the Corps issued a draft water supply reallocation report for Lake Lanier in order to convert expiring water withdrawal contracts to water storage contracts, and in anticipation of the need to obtain Congressional authorization for permanent storage contracts to support the increased M&I water withdrawals for the Atlanta metropolitan water utilities – as the Corps is required to do under the WSA and its own guidelines.  The Corps proposed to reallocate approximately 20% of the conservation storage or a yield of approximately 185-million gallons per day from the Buford Dam and Reservoir for M&I use, with projected increased allocations of up to 529-million gallons per day by 2010.

89.      The Corps prepared the draft reallocation report in anticipation of seeking Congressional authorization, as required by statute, for the reallocation of water storage in the Buford Dam to serve M&I uses.  The Corps, however, never formally presented it to Congress, and did not request Congressional authorization for the proposed reallocation.

### The Corps' Actions Result in Litigation

90.      In response to the draft reallocation report and water control plan, the State of Alabama filed a lawsuit in 1990, under the WSA and NEPA, against the Corps' proposed reallocation.  With the lawsuit, the Corps' actions to implement the program to establish the required water storage contracts ceased.

91.     As a direct result of the lawsuit, negotiations commenced among the States of Alabama, Florida, Georgia, and the Corps, resulting in a Memorandum of Agreement[125] executed on January 3, 1992.  The MOA contained a provision that purported to permit existing water users to increase water withdrawal amounts to meet reasonable needs over the period of time necessary for the States to negotiate a solution to the water issues subject to the requirements of federal law.  The parties to the MOA agreed to conduct a three-year Comprehensive Study of the ACF River System to determine future uses of the water.

92.     When the Comprehensive Study extended over six years and disagreements over water allocations along the ACF River Basin persisted, Congress adopted the ACF Interstate Compact,[126] consisting of the States of Alabama, Florida, and Georgia.[127]  The objective of the Compact was to facilitate agreement among the States for water allocation in the ACF River Basin.  The Compact terminated in 2003 without agreement among the States on water storage allocation.

93.     On May 16, 2000, the Governor of Georgia requested final agency action by the Corps requesting the Corps:  (a) allow municipal and industrial water withdrawals from Lake Lanier to increase from the 1999 annual average of 131-million gallons per day,[128] to a projected annual average of 297 MGD by 2030; (b) release sufficient water from Buford Dam to provide for increased M&I water withdrawals from the Chattahoochee River below the dam; and (c) provide certainty for these M&I water withdrawals by entering into long-

---

[125] Hereinafter, "MOA."

[126] Hereinafter, "Compact."

[127] Apalachicola-Flint-Chattahoochee River Basin Compact, Pub. L. No. 105-104, 111 Stat. 2219 (1997).

[128] Hereinafter, "MGD."

term contracts with Georgia or certain M&I water users.  By letter dated April 15, 2002, the Acting Assistant Secretary of the Army for Civil Works denied these requests because they required Congressional authorization under the WSA.  Georgia subsequently brought action against the Corps in federal district court for judicial review of the Corps' denial.  This suit would become *Georgia I* in the multidistrict litigation proceedings.

94.     On March 7, 2006, and as subsequently revised on June 12, 2006, September 7, 2006, March 2, 2007, November 7, 2007, and April 15, 2008, the Corps implemented the Interim Operations Plan[129] for Jim Woodruff Lock and Dam, a federal reservoir downstream of Buford in the ACF River Basin.  The IOP, issued in connection with the Corps' initiation of formal consultation with the U.S. Fish and Wildlife Service[130] under Section 7 of the Endangered Species Act[131] and subsequently modified, sets rules for the Corps' operation of the federal reservoirs in the ACF River Basin for the alleged purpose of providing adequate flows for two species of federally protected freshwater mussels species and for the Gulf sturgeon.  Alabama, Florida, and Georgia each filed suit against the Corps and the Service in federal district court to enjoin the Corps' operations under the IOP.  These suits would become the *Alabama Case*, the *Florida Case*, and *Georgia II* in the multidistrict litigation proceedings.

## Injury

95.     Hydropower is at present the least expensive and one of the most environmentally friendly sources of electricity available to the SeFPC's members.  The

---

[129] Hereinafter, "IOP."

[130] Hereinafter, "Service."

[131] 7 U.S.C. § 136, 16 U.S.C. § 1531, *et seq.* (2000).

SeFPC's members have power needs that greatly exceed the amount of hydropower available from the Buford Project, even if there were no diversions of water to M&I use.  Accordingly, when hydropower production is reduced, the energy must be replaced from a more expensive fossil-fuel source.  During 2000, when the SeFPC brought this action against the Defendants, the cost of SeFPC's members' hydropower energy from SEPA was 7.21 mills/kWh, whereas SEPA's average replacement energy in 2000 cost approximately 65 mills/kWh, or nine times the cost of hydropower.  Most recently, in 2008, the SeFPC's cost for hydropower energy is 9.32 mills/kWh, but the average replacement energy costs approximately 113 mills/kWh, or twelve times the cost of hydropower.

96.     Preference customers such as the SeFPC's members are harmed by the Corps' current process of crediting the hydropower purpose for the diversion of storage to M&I, because the authorized users are not made whole in the event of a reallocation. Consequently, the harm to SeFPC members is that the Corps has failed to credit the hydropower component based on the replacement cost/benefits forgone methodology, which (in virtually all cases) greatly exceeds revenues forgone.  Because the Corps has not provided the hydropower component the equivalent of replacement power costs or benefits forgone, the Corps has failed to ensure that water diversions do not adversely or seriously affect the authorized hydropower purpose.  Further, the Corps' continuing allocation of storage space for water supply constitutes a major operational change under the WSA and the D.C. Circuit Decision.

97.     The Corps' current crediting actions are inconsistent with its own guidelines on the replacement cost of energy and capacity, which guidelines specify that the derivation

of replacement costs be based upon hydropower benefits forgone.   The guidelines specifically provide:

> For reallocation from hydropower the replacement cost of power should normally be considered equal to the benefits foregone and calculated in accordance with [Principles and Guidelines ("P&G")] procedures for evaluating hydropower benefits.   In cases where the power marketing agency has existing customer contracts, the replacement cost of power may be estimated as the agency's cost of obtaining power from the lowest cost alternative source for the duration of the contracts.    Once the contracts expire and for the remainder of the period of analysis the replacement cost of power should be equal to the benefits foregone. Documentation of the contracts and estimates of replacement costs of power to fulfill them should be included in the reallocation report.[132]

98.     It follows from the preceding paragraph that replacement power costs should be credited to those losing benefits, because it is the only way to make the authorized hydropower users whole.  However, the Corps is currently crediting the Southeastern Federal Power Program based on the revenues forgone methodology – a mechanism that results in credits far below the replacement power costs actually needed by authorized hydropower users to compensate them for having to obtain power from alternative sources.

99.     The Corps is at present charging M&I users from $1.73 to $21.55 per million gallons for withdrawals of water supplied from the Buford Project.  Supplying the water, however, imposes an economic cost substantially greater than the amount charged based on the replacement cost of the hydropower lost.  The price charged for the M&I water use is only a fraction of the economic cost of that use.

---

[132] USACE ER 1105-2-100, App. E, ¶ E-57d.(2)(c)(2) (Apr. 22, 2000).

100.    Since 1994, SEPA's rates have been adjusted in 1998, 2002, 2003, and 2007. Meanwhile, the price charged by the Corps to M&I water users for the diverted water at issue is based, and to the best of the SeFPC's knowledge continues to be based, on SEPA rates in effect in 1999.  These 1999 rates do not even cover the current level of revenues forgone, because the Corps has failed to update its pricing in conjunction with SEPA's current rates.

101.    The underpricing of the M&I water use, as previously described, injures the SeFPC's members.  It also creates false price signals for the M&I users.  The underpricing encourages the increased use of water from the Buford Project, and discourages conservation and the development of alternative sources of water.  Because the underpricing creates an incentive for greater use of water from the Buford Project, in turn it also injures the SeFPC's members by reducing the volume of water available for hydropower production.

102.    When water is diverted from the reservoir at Lake Lanier to M&I uses, it cannot be used for hydropower generation.  For example, during 1999 an annual average of approximately 111 MGD of water[133] were withdrawn from Lake Lanier for M&I purposes. The resulting power loss to the SeFPC customers amounted to approximately 21 megawatts[134] and approximately 35,000 megawatt hours.[135]  Based only on the SeFPC customers' average cost of replacement power, the 35,000 MWH lost power production would represent approximately $2 million in increased costs, and the 21 MW lost capacity would represent approximately $6.5 million in increased costs for replacement capacity.

---

[133] Included in this amount are the "grandfathered" withdrawal rights.  The SeFPC does not challenge the "grandfathered" amounts.

[134] Hereinafter, "MW."

[135] Hereinafter, "MWH."

However, since hydropower production at the Buford Project is timed for periods of peak electric demand when the cost of replacement power is highest, the actual loss to the SeFPC customers during 1999 was greater than as described here.

103.    As authorized by Congress and constructed by the Corps, two 40,000 KW generators at the Buford Dam and Reservoir operate primarily at peak periods; i.e., during the hours of greatest demand for electric power.  Only one 6,000 KW unit was authorized to operate during non-peak periods in order to allow stabilized minimum flows.  However, to permit the flow of water downstream of the Buford Dam, water in excess of that needed to operate the 6,000 KW unit has been and continues to be released at periods of off-peak electric demand from the Buford Reservoir when the 40,000 KW generators would not otherwise be operated.  Release of this additional water at periods of off-peak electric demand also harms the SeFPC members by reducing the water available for hydropower production when the power is needed most and when replacement power is most expensive.

104.    Water withdrawals from Lake Lanier for M&I purposes also affect the generation of hydropower from the federal projects downstream of the Buford Dam because the less water there is available in Lake Lanier as a consequence of the unlawful withdrawals, the less water there is available to flow through the downstream turbines, resulting in less hydropower generating capacity and less hydropower available for the SeFPC's members.

105.    The following table depicts the SeFPC's harm in hydropower benefits forgone, from 1994 (the year after which all water supply contracts expired) to 2002:[136]

| Year | Hydropower Benefits Forgone (MWH) | Hydropower Benefits Forgone (KW) | Hydropower Benefits Forgone ($) |
|------|-----------------------------------|----------------------------------|---------------------------------|
| 1994 | 23,244.10 | 13,889.76 | $5,499,371 |
| 1995 | 26,265.18 | 15,695.05 | $6,214,137 |
| 1996 | 27,637.35 | 16,515.00 | $6,538,782 |
| 1997 | 27,579.65 | 16,480.52 | $6,525,130 |
| 1998 | 33,181.43 | 19,827.93 | $7,850,468 |
| 1999 | 35,858.41 | 21,427.59 | $8,483,820 |
| 2000 | 34,784.01 | 20,785.57 | $8,229,625 |
| 2001 | 34,870.61 | 20,837.32 | $8,250,115 |
| 2002[137] | 33,950.26 | 20,287.35 | $8,032,365 |
| **Totals** | **277,371** | **165,746.09** | **$65,623,813** |

[136] Data provided in this table excludes "grandfathered" withdrawals.  The SeFPC does not challenge the "grandfathered" amounts.  Further, all data regarding Corps operations provided in this complaint is based on publicly available, un-audited information, and is subject to change after the administrative record is produced.  As a result, quantification of the SeFPC's harm as described herein may change, and the SeFPC reserves the right to update information regarding its harm upon receipt of the administrative record.

[137] The SeFPC expects that the Corps will provide in its administrative record data that would permit the completion of this chart from 2003 to the present.

**GROUNDS FOR RELIEF**

I.  **ABSENT APPROPRIATE CREDITING TO THE HYDROPOWER PURPOSE, THE DIVERSION OF STORAGE IN BUFORD DAM TO WATER SUPPLY DOES NOT MEET THE SERIOUSLY-AFFECT-PROJECT-PURPOSES PRONG OF THE WATER SUPPLY ACT.**

106.    The SeFPC repeats the allegations contained in paragraphs 1 through 105 as if fully set forth herein.

107.    Congress authorized the Buford Dam and Reservoir for hydropower generation, flood control, and navigation.

108.    Section 390b of the WSA provides, in relevant part:

> Modifications of a reservoir project heretofore [before July 3, 1958] authorized, surveyed, planned, or constructed to include storage as provided in subsection (b)[138] which would seriously affect the purposes for which the project was authorized, surveyed, planned, or constructed . . . shall be made only upon the approval of Congress as now [on July 3, 1958] provided by law.[139]

109.    The Corps has diverted, and continues to divert, significant amounts of storage space to water supply, resulting in ever-increasing water withdrawals by M&I users.

110.    The Corps' actions in diverting storage to water supply seriously affect the hydropower purpose of the Buford Dam and Reservoir.

111.    There has been no Congressional allocation or reallocation of any of the storage capacity in Lake Lanier to M&I uses of water.

---

[138] 43 U.S.C. § 390b(b) provides in relevant part that "storage may be included in any reservoir project surveyed, planned, constructed or to be planned, surveyed and/or constructed by the Corps of Engineers or the Bureau of Reclamation to impound water for present or anticipated future demand or need for municipal or industrial water[.]"

[139] 43 U.S.C. § 390b(d) (2000).

112.    The Corps has not credited SEPA for the benefit of hydropower customers with the cost of alternative energy to substitute for the hydropower benefits lost by the diversion of water storage in the Buford Project to M&I use.

113.    The Corps' actions in diverting storage in the Buford Dam and Reservoir to water supply, without properly crediting the hydropower purpose, do not meet the seriously-affect-project-purposes prong of the WSA.

114.    Without appropriate crediting to the hydropower purpose, the SeFPC's members have suffered, and will continue to suffer unless remedied by this Court, significant harm due to the Corps' diversion of storage in the Buford Dam and Reservoir to water supply that seriously affects the hydropower purpose of the project.

115.    The SeFPC has suffered this legal wrong because of the Corps' actions and failures to act described above, and is entitled to judicial review under 5 U.S.C. § 702.

116.    The Corps' actions in diverting storage in the Buford Dam and Reservoir to water supply, without properly crediting the hydropower purpose, constitute final and reviewable agency actions under 5 U.S.C. § 704.

117.    In failing to properly credit the hydropower purpose as a result of the diversion of water storage in the Buford Project to M&I use, the Corps has unlawfully withheld and unreasonably delayed agency action under 5 U.S.C. § 706(1).

118.    The Corps' actions and failures to act described above are arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without factual or legal substantiation, and should be remedied and set aside under 5 U.S.C. § 706(2).

119.    The SeFPC has exhausted any and all available remedies.

120.    Any and all conditions precedent to the SeFPC's right to bring this claim have occurred or been satisfied.

121.    The Corps' actions and failures to act are unlawful and should be remedied and set aside; and the Corps should be directed to charge only such rates and make only such credits as are in accordance with the law.

II.     **ABSENT APPROPRIATE CREDITING TO THE HYDROPOWER PURPOSE, THE CORPS' SHIFTING OF HYDROPOWER GENERATION FROM PEAK TO NON-PEAK TIME PERIODS TO ACCOMMODATE FOR MUNICIPAL AND INDUSTRIAL WATER USE DOES NOT MEET THE MAJOR-OPERATIONAL-CHANGES PRONG OF THE WATER SUPPLY ACT.**

122.    The SeFPC repeats the allegations contained in paragraphs 1 through 121 as if fully set forth herein.

123.    Since the late 1980s and early 1990s, the Corps has accommodated M&I water use by shifting some on-peak generation to off-peak generation.

124.    Time periods of peak demand are, again, those periods during which the generation of hydropower has been and is most valuable to SeFPC members.

125.    Congress intended the hydropower operations at Buford Dam to be conducted predominantly during periods of peak demand.

126.    The shift of hydropower generation from peak to non-peak time periods amounts to a major operational change.

127.    Congress has not authorized the Corps to shift hydropower generation at the Buford Dam from peak to non-peak time periods.

128.    The Corps' actions in shifting hydropower generation from peak to non-peak time periods to accommodate M&I water use do not meet the major-operational-changes prong of the WSA.

129.    Without appropriate crediting to the hydropower purpose, the SeFPC's members have suffered, and will continue to suffer unless remedied by this Court, significant harm due to the Corps' shifting of hydropower generation from peak to non-peak time periods to accommodate for M&I water use.

130.    The SeFPC has suffered this legal wrong because of Corps actions and failures to act, and is entitled to judicial review under 5 U.S.C. § 702.

131.    The Corps' actions in shifting hydropower generation from peak to non-peak time periods to accommodate for M&I water use constitute final and reviewable agency actions under 5 U.S.C. § 704.

132.    In failing to properly credit the hydropower purpose as a result of the shifting of hydropower generation from peak to non-peak time periods to accommodate M&I water use, the Corps has unlawfully withheld and unreasonably delayed agency action under 5 U.S.C. § 706(1).

133.    The Corps' actions and failures to act described above are arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without factual or legal substantiation, and should be remedied and set aside under 5 U.S.C. § 706(2).

134.    The SeFPC has exhausted any and all available remedies.

135.    Any and all conditions precedent to the SeFPC's right to bring this claim have occurred or been satisfied.

136.    The Corps' actions and failures to act are unlawful and should be remedied and set aside; and the Corps should be directed to charge only such rates and make only such credits as are in accordance with the law.

## III.    THE DIVERSION OF STORAGE IN THE BUFORD DAM TO WATER SUPPLY IS NOT AUTHORIZED BY THE SURPLUS WATER PROVISION OF THE FLOOD CONTROL ACT.

137.    The SeFPC repeats the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

138.    Section 6 of the FCA provides, in relevant part:

> The Secretary of the Army is authorized to make contracts with States, municipalities, private concerns, or individuals, at such prices and on such terms as he may deem reasonable, for domestic and industrial uses for surplus water that may be available at any reservoir under the control of the Department of the Army: Provided, That no contracts for such water shall adversely affect then existing lawful uses of such water.[140]

139.    Corps guidelines define surplus water as either:

> (1) water stored in a Department of the Army reservoir that is not required because the authorized use for the water never developed or the need was reduced by changes that occurred since authorization or construction; or

> (2) water that would be more beneficially used as municipal and industrial water than for the authorized purpose and which, when withdrawn, would not

---

[140] 33 U.S.C. § 708 (2000).

significantly affect authorized purposes over some specified time period.[141]

140.     Congress has explicitly stated that there is no surplus water in the Buford Dam and Reservoir:

> [T]he Department of the Army cannot legally enter into a contract with [Gwinnett] county pursuant to section 6 of the 1944 Flood Control Act . . . since that section applies only to surplus water, whereas there actually will be no surplus water in the [Buford Dam and] reservoir.[142]

141.     The Corps has made no determination that there is surplus water in the Buford Dam and Reservoir.

142.     As a matter of fact, there is indeed no surplus water in the Buford Dam and Reservoir.

143.     Since the end of 1993, there has been no contract covering any of the M&I withdrawals of water from the Buford Dam and Reservoir.

144.     The Corps has diverted, and continues to divert, significant amounts of storage space to water supply, resulting in ever-increasing water withdrawals by M&I users.

145.     The Corps' actions in diverting non-surplus water storage, and failure to halt such diversion, in the Buford Dam and Reservoir to water supply do not meet the FCA requirement that the Corps may enter into contracts for water only if that water is surplus.

146.     The SeFPC's members have suffered significant harm due to the Corps' diversion of storage of non-surplus water in the Buford Dam and Reservoir to water supply.

---

[141] USACE ER 1105-2-100, App. E, ¶ E-57b.(2)(a) (Apr. 22, 2000).

[142] *See* S. Rep. No. 84-2689, at 2 (1956); H. R. Rep. No. 84-2672, at 2 (1956).

147.    Unless enjoined, the SeFPC's members will continue to suffer significant harm due to the Corps' diversion of storage of non-surplus water in the Buford Dam and Reservoir to water supply.

148.    The SeFPC has suffered this legal wrong because of the Corps' actions and failures to act described above, and is entitled to judicial review under 5 U.S.C. § 702.

149.    The Corps' actions in diverting storage to water supply, without a determination that there is surplus water in the Buford Dam and Reservoir, constitute final and reviewable agency actions under 5 U.S.C. § 704.

150.    In failing to halt the diversion of non-surplus water storage in the Buford Dam and Reservoir to water supply, the Corps has unlawfully withheld and unreasonably delayed agency action under 5 U.S.C. § 706(1).

151.    The Corps' actions and failures to act described above are arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without factual or legal substantiation, and should be remedied and set aside under 5 U.S.C. § 706(2).

152.    The SeFPC has exhausted any and all available remedies.

153.    Any and all conditions precedent to the SeFPC's right to bring this claim have occurred or been satisfied.

154.    The Corps' actions and failures to act are unlawful and should be remedied and set aside; and the Corps should be directed to charge only such rates and make only such credits as are in accordance with the law.

**IV.     ABSENT APPROPRIATE CREDITING TO THE HYDROPOWER PURPOSE, THE DIVERSION OF STORAGE IN THE BUFORD DAM TO WATER SUPPLY ALSO ADVERSELY AFFECTS THE EXISTING LAWFUL HYDROPOWER USE OF SUCH WATER AND THUS FAILS TO MEET THE REQUIREMENTS OF THE FLOOD CONTROL ACT.**

155.     The SeFPC repeats the allegations contained in paragraphs 1 through 154 as if fully set forth herein.

156.     The existing lawful uses of the water in the Buford Dam and Reservoir are hydropower generation, flood control, and navigation.

157.     Section 6 of the FCA prohibits water withdrawals that would "adversely affect then existing lawful uses of such water."

158.     The Corps has diverted, and continues to divert, significant amounts of storage space to water supply, resulting in ever-increasing water withdrawals by M&I users.

159.     The Corps' actions in diverting storage in the Buford Dam and Reservoir to water supply adversely affect the existing lawful use of such water for hydropower generation and thus do not meet the FCA.

160.     The Corps has not credited the hydropower purpose with the cost of alternative energy to substitute for the hydropower benefits lost by the diversion of storage water in the Buford Project to M&I use.

161.     Without appropriate crediting to the hydropower purpose, the SeFPC's members have suffered, and will continue to suffer unless remedied by this Court, significant harm due to the adverse effect to the existing lawful hydropower use of such water caused by the Corps' diversion of storage in the Buford Dam and Reservoir to water supply.

162.    The SeFPC has suffered this legal wrong because of Corps actions and failures to act, and is entitled to judicial review under 5 U.S.C. § 702.

163.    The Corps' actions in diverting storage in the Buford Dam and Reservoir for water supply, without properly crediting the hydropower purpose, constitute final and reviewable agency actions under 5 U.S.C. § 704.

164.    In failing to properly credit the hydropower purpose as a result of the diversion of water storage in the Buford Project to M&I use, the Corps has unlawfully withheld and unreasonably delayed agency action under 5 U.S.C. § 706(1).

165.    The Corps' actions and failures to act described above are arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without factual or legal substantiation, and should be remedied and set aside under 5 U.S.C. § 706(2).

166.    The SeFPC has exhausted any and all available remedies.

167.    Any and all conditions precedent to the SeFPC's right to bring this claim have occurred or been satisfied.

168.    The Corps' actions and failures to act are unlawful and should be remedied and set aside; and the Corps should be directed to charge only such rates and make only such credits as are in accordance with the law.

**V.    ABSENT APPROPRIATE CREDITING TO THE HYDROPOWER PURPOSE, THE DIVERSION OF STORAGE IN THE BUFORD DAM TO WATER SUPPLY DOES NOT MEET THE PREFERENCE POWER PROVISION OF THE FLOOD CONTROL ACT.**

169.    The SeFPC repeats the allegations contained in paragraphs 1 through 168 as if fully set forth herein.

- 60 -

170.    Section 5 of the FCA provides:

> Electric power and energy generated at reservoir projects under the control of the Department of the Army and in the opinion of the Secretary of the Army not required in the operation of such projects shall be delivered to the Secretary of Energy who shall transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles, the rate schedules to become effective upon confirmation and approval by the Secretary of Energy.

> \* \* \* \* \* \* \* \*

> Preference in the sale of such power and energy shall be given to public bodies and cooperatives.[143]

171.    SEPA is obligated to replace contractual hydropower with more expensive fossil-fuel energy when there is insufficient hydropower to deliver due to decreased storage available for hydropower operations.

172.    The Corps does not appropriately credit the hydropower purpose for the cost of replacement power necessitated by the Corps' increasing allocations of storage space to M&I users for water withdrawals.

173.    SEPA recovers the cost of replacement power through higher rates to its hydropower preference customers such as the SeFPC's members.

174.    By this mechanism, hydropower rates include the cost of the more expensive replacement power, and preference customers such as the SeFPC members do not receive hydropower at the "lowest possible rates" because they must pay for the cost of more expensive alternative power without proper crediting to the hydropower purpose, for the

---

[143] 16 U.S.C. § 825s (2000).

Corps' action in diverting storage to M&I use resulting in less energy and capacity for hydropower generation.

175.    The Corps has not credited the hydropower purpose with the cost of alternative energy to substitute for the benefits forgone by the diversion of storage in the Buford Project to M&I water use.

176.    The Corps has diverted, and continues to divert, significant amounts of storage space to water supply, resulting in ever-increasing water withdrawals by M&I users.

177.    The Corps' actions in diverting water to M&I users, without properly crediting the hydropower purpose, do not meet the preference power provision of the FCA because, as a result of such diversion without appropriate crediting to the hydropower purpose, preference customers, such as the SeFPC's members, are not able to purchase power at the "lowest possible rates."

178.    Without appropriate crediting to the hydropower purpose, the SeFPC's members have suffered, and will continue to suffer unless remedied by this Court, significant harm due to the Corps' diversion of storage in the Buford Dam and Reservoir to water supply.

179.    The SeFPC has suffered this legal wrong because of Corps actions and failures to act, and is entitled to judicial review under 5 U.S.C. § 702.

180.    The Corps' actions in diverting storage in the Buford Dam and Reservoir to water supply, without properly crediting the hydropower purpose, constitute final and reviewable agency actions under 5 U.S.C. § 704.

181.    In failing to properly credit the hydropower purpose as a result of the diversion of water storage in the Buford Project to M&I use, the Corps has unlawfully withheld and unreasonably delayed agency action under 5 U.S.C. § 706(1).

182.    The Corps' actions and failures to act described above are arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without factual or legal substantiation, and should be remedied and set aside under 5 U.S.C. § 706(2).

183.    The SeFPC has exhausted any and all available remedies.

184.    Any and all conditions precedent to the SeFPC's right to bring this claim have occurred or been satisfied.

185.    The Corps' actions and failures to act are unlawful and should be remedied and set aside; and the Corps should be directed to charge only such rates and make only such credits as are in accordance with the law.

## VI.    IN THE ABSENCE OF APPROPRIATE CREDITING TO THE HYDROPOWER PURPOSE, THE CORPS HAS FAILED TO COMPLY WITH ITS OWN GUIDELINES REGARDING THE REALLOCATION OF STORAGE SPACE.

186.    The SeFPC repeats the allegations contained in paragraphs 1 through 185 as if fully set forth herein.

187.    The guidelines of the Corps for the reallocation of storage to M&I water supply under the WSA are contained in USACE ER 1105-2-100.  They provide, in pertinent part:

> Reallocation or addition of storage that would seriously affect other authorized purposes or that would involve major structural or operational changes requires

Congressional approval.  Provided these criteria are not violated, 15 percent of the total storage capacity allocated to all authorized project purposes or 50,000 acre feet, whichever is less, may be allocated from storage authorized for other purposes.[144]

\* \* \* \* \* \* \* \*

Reallocation or addition of storage that would have a severe effect on other authorized purposes or that would involve major structural or operational changes requires Congressional approval.  Providing the above criteria are not violated, 15 percent of total storage capacity allocated to all authorized project purposes or 50,000 acre feet, whichever is less, may be allocated from storage authorized for other purposes or may be added to the project to serve as storage for municipal and industrial water supply at the discretion of the Commander, USACE.  For reallocations up to 499 acre-feet the Commander, USACE has delegated approval authority to the Division commanders.  Reallocations which exceed the Commander's authority may be approved at the discretion of the Secretary of the Army if such reallocations do not require Congressional approval as described above.  All reallocations or additions of storage should be to serve immediate needs.  All reallocations or additions of storage must be accompanied by a report that includes:

(a) Purpose of the report and Background, including map

(b) Pertinent project data table

(c) Water supply needs analysis

(d) Test of financial feasibility

(e) Cost of storage analysis

(f) Analysis of alternatives considered to address the water supply needs

---

[144] USACE ER 1105-2-100, ¶ 3-8b.(5) (Apr. 22, 2000).

(g) Appropriate NEPA documentation of environmental impacts

(h) Pertinent letters from affected Federal, state and local interests, including documentation of public review and comment.  Opportunities for public review and comment must be provided.

(i) Commander's recommendation.[145]

\* \* \* \* \* \* \* \*

The cost allocated to the non-Federal sponsor (i.e., the price to be charged for the capital investment for the reallocated storage) will normally be established as the highest of the benefits or revenues foregone, the replacement cost, or the updated cost of storage in the Federal project.

(a) Benefits Foregone.  Benefits foregone are generally estimated using standard Corps NED economic evaluation criteria in compliance with the P&G.  For small reallocations from hydropower (i.e., within the Chief of Engineers discretionary authority), benefits may be based on current estimates of long term power rates.  These may be obtained from in house power value estimating procedures or otherwise in accordance with the P&G.  For large reallocations, estimates should be calculated in accordance with P&G procedures for evaluation of hydropower benefits.

(b) Revenues Foregone.  Revenues foregone to hydropower are the reduction in revenues accruing to the Treasury as a result of the reduction in hydropower outputs based on the existing rates charged by the power marketing agency. . . .

(c) Replacement Costs.

(1) If the reallocation is from flood control it is appropriate to utilize the replacement cost of equivalent protection.  This would not be appropriate for

---

[145] USACE ER 1105-2-100, App. E, ¶ E-57d.(1) (Apr. 22, 2000).

reallocations within the Corps discretionary authority which by definition do not have severe impacts.

(2) For reallocation from hydropower the replacement cost of power should normally be considered equal to the benefits foregone and calculated in accordance with P&G procedures for evaluating hydropower benefits. In cases where the power marketing agency has existing customer contracts, the replacement cost of power may be estimated as the agency's cost of obtaining power from the lowest cost alternative source for the duration of the contracts.  Once the contracts expire and for the remainder of the period of analysis the replacement cost of power should be equal to the benefits foregone. Documentation of the contracts and estimates of replacement costs of power to fulfill them should be included in the reallocation report.

(d) Updated Cost of Storage.   The costs to be reallocated to the water supply storage are determined by first computing the costs at the time of construction by subtracting the specific costs from the total construction cost and multiplying the result by the ratio of storage reallocated (ac-ft) to total usable storage space (ac-ft). . . .[146]

\* \* \* \* \* \* \* \*

If hydropower revenues are being reduced as a result of the reallocation, the power marketing agency will be credited for the amount of revenues to the Treasury foregone as a result of the reallocation assuming uniform annual repayment.  In instances where existing contracts between the power marketing agency and its customer would result in a cost to the Federal Government to acquire replacement power to fulfill the obligations of contracts, an additional credit to the power marketing agency can be made for such costs incurred during the remaining period of the contracts. Such credits should not actually be made for

---

[146] USACE ER 1105-2-100, App. E, ¶ E-57d.(2) (Apr. 22, 2000).

replacement costs until the costs are incurred and documented by the power marketing agency.[147]

188.   These guidelines contain specific prerequisites to reallocation of storage to M&I water supply that have not been met.

189.   The use of water storage from the Buford Project for M&I purposes requires more than the lesser of fifteen percent of the total storage capacity or 50,000 acre-feet.

190.   The Secretary of the Army has not approved the use of storage from the Buford Dam and Reservoir for water supply.

191.   The Corps has not prepared the required report with the prescribed analysis of the impact of diverting water storage in the Buford Dam and Reservoir to water supply.

192.   The Corps is charging M&I users a price for the water that is only a fraction of that which the guidelines state should normally be applied.

193.   The Corps' actions in diverting storage in the Buford Dam and Reservoir to water supply fail to comply with the Corps' guidelines regarding the reallocation of storage space.

194.   Without appropriate crediting to the hydropower purpose, the SeFPC's members have suffered, and will continue to suffer unless remedied by this Court, significant harm due to the Corps' diversion of water storage in the Buford Dam and Reservoir to water supply.

195.   The SeFPC has suffered this legal wrong because of Corps actions and failures to act, and is entitled to judicial review under 5 U.S.C. § 702.

---

[147] USACE ER 1105-2-100, App. E, ¶ E-57d.(3) (Apr. 22, 2000).

196.     The Corps' actions in diverting storage in the Buford Dam and Reservoir to water supply, without properly crediting the hydropower purpose, constitute final and reviewable agency actions under 5 U.S.C. § 704.

197.     In failing to properly credit the hydropower purpose as a result of the diversion of water storage in the Buford Project to M&I use, the Corps has unlawfully withheld and unreasonably delayed agency action under 5 U.S.C. § 706(1).

198.     The Corps' actions and failures to act described above are arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without factual or legal substantiation, and should be remedied and set aside under 5 U.S.C. § 706(2).

199.     The SeFPC has exhausted any and all available remedies.

200.     Any and all conditions precedent to the SeFPC's right to bring this claim have occurred or been satisfied.

201.     The Corps' actions and failures to act are unlawful and should be remedied and set aside; and the Corps should be directed to charge only such rates and make only such credits as are in accordance with the law.

## VII.    IN THE ABSENCE OF APPROPRIATE CREDITING TO THE HYDROPOWER PURPOSE, THE CORPS HAS FAILED TO COMPLY WITH ITS OWN GUIDELINES REGARDING WATER WITHDRAWALS.

202.     The SeFPC repeats the allegations contained in paragraphs 1 through 201 as if fully set forth herein.

203.     The Corps' guidelines for the right to withdraw water under Section 6 of the FCA are set out in USACE ER 1105-2-100.  They provide, in pertinent part:

Under Section 6 of the Flood Control Act of 1944, the Secretary of the Army is authorized to make agreements with states, municipalities, private concerns, or individuals for surplus water that may be available at any reservoir under the control of the Department. These agreements may be for domestic, municipal, and industrial uses, but not for crop irrigation. When the user desires long-term use, a permanent storage reallocation should be performed under the authority of the Water Supply Act of 1958, as amended. Surplus water is either water stored in a Department of the Army reservoir that is not required because the authorized use for the water never developed or the need was reduced by changes that occurred since authorization or construction, or water that would be more beneficially used as municipal and industrial water than for the authorized purposes over some specific time period. Use of the Section 6 authority is allowed only where non-Federal sponsors do not want to purchase storage because: use of the water is needed for a short term only or use would be temporary pending development of the authorized use and reallocation of storage is not appropriate.[148]

204.   These guidelines contain specific prerequisites to the sale of water that have not been met.

205.   For M&I water withdrawals from the Buford Dam and Reservoir, there has been no declaration of surplus, there are no contracts (excluding grandfathered agreements), there has been no report as to how and why the water was determined to be surplus, and the price being charged does not meet even the minimum amount prescribed in the Corps' own guidelines.

206.   The Corps' actions in diverting storage in the Buford Dam and Reservoir to water supply fail to comply with the Corps' guidelines regarding water withdrawals.

---

[148] USACE ER 1105-2-100, ¶ 3-8b.(4) (Apr. 22, 2000).

207.    Without appropriate crediting to the hydropower purpose, the SeFPC's members have suffered, and will continue to suffer unless remedied by this Court, significant harm due to the Corps' diversion of water storage in the Buford Dam and Reservoir to water supply.

208.    The SeFPC has suffered this legal wrong because of Corps actions and failures to act, and is entitled to judicial review under 5 U.S.C. § 702.

209.    The Corps' actions in diverting storage in the Buford Dam and Reservoir to water supply, without properly crediting the hydropower purpose, constitute final and reviewable agency actions under 5 U.S.C. § 704.

210.    In failing to properly credit the hydropower purpose as a result of the diversion of water storage in the Buford Project to M&I use, the Corps has unlawfully withheld and unreasonably delayed agency action under 5 U.S.C. § 706(1).

211.    The Corps' actions and failures to act described above are arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without factual or legal substantiation, and should be remedied and set aside under 5 U.S.C. § 706(2).

212.    The SeFPC has exhausted any and all available remedies.

213.    Any and all conditions precedent to the SeFPC's right to bring this claim have occurred or been satisfied.

214.    The Corps' actions and failures to act are unlawful and should be remedied and set aside; and the Corps should be directed to charge only such rates and make only such credits as are in accordance with the law.

**VIII.   THE CORPS HAS FAILED TO FOLLOW THE PROCESS MANDATED BY NEPA, THE CEQ NEPA REGULATIONS, AND THE CORPS' NEPA PROCEDURES.**

215.   The SeFPC repeats the allegations contained in paragraphs 1 through 214 as if fully set forth herein.

216.   NEPA and the CEQ regulations require federal agencies to evaluate the environmental consequences of proposed major federal actions before implementing those actions.

217.   The Corps' NEPA procedures mandate the development of an environmental assessment or EIS prior to taking certain actions related to project purposes:

> Actions normally requiring an EIS are:
>
> (a) Feasibility reports for authorization and construction of major projects;
>
> (b) Proposed changes in projects which increase size substantially or add additional purposes; and
>
> (c) Proposed major changes in the operation and/or maintenance of completed projects.[149]
>
> Actions normally requiring an EA, but not an EIS, are:
>
> (d) *Construction and Operations and Maintenance.* Changes in environmental impacts which were not considered in the project EIS or EA. Examples [include] changes in pool level operations[.][150]

218.   The withdrawals for M&I purposes, and the Corps' actions and failures to act previously described, individually and cumulatively, are the direct products of actions, decisions, and failures to act by the Corps that:  (a) have had and continue to have major

---

[149] 33 C.F.R. § 230.6 (2007).

[150] 33 C.F.R. § 230.7(d) (2007).

adverse impacts on the capacity and ability of the Buford Dam and Reservoir facilities to generate electricity; (b) have substantially interfered with and diminished the rights of authorized hydropower customers; and (c) have had and continue to have major adverse impacts to the environment, both at and in the vicinity of the facilities and, as a result of forcing customers to obtain lost power from alternative power generating facilities, create increased environmental impacts from these alternative generating facilities.

219.    Compounding and exacerbating the environmental consequences of the numerous and massive withdrawals permitted and authorized by the Corps is the fact that the Corps accepts withdrawal statistics supplied by the customers, makes no effort to monitor or control the volume of withdrawals actually occurring, and, upon information and belief, is not actively attempting to do so.

220.    The decisions and actions of the Corps regarding diversions of water storage in the Buford Dam and Reservoir to M&I use individually and cumulatively constitute major federal actions within the meaning of NEPA.  The environmental impacts of these decisions and actions may – and indeed will – have a significant impact on the quality of the human environment, and must be subjected to scrutiny under NEPA.

221.    The Corps failed to prepare an EIS or an EA prior to permitting the diversion of water storage in the Buford Dam and Reservoir to M&I use and the resulting water supply withdrawals.

222.    The following actions of the Corps are arbitrary and capricious, and otherwise not in accordance with the law individually, collectively, and cumulatively, and are contrary

to NEPA regulations and to the Corps' NEPA procedures, all of which require statutory environmental analyses to be performed for major federal actions:

(a) its failure and refusal under NEPA to assess its actions and decisions concerning the diversion of water storage to M&I use and the resulting water withdrawals from the Buford Dam and Reservoir;

(b) its acquiescence and permission to continue diversions of water storage and the resulting withdrawals after the expiration of the water supply contracts; and

(c) its decision to allow diversions of storage to M&I use and the resulting withdrawals to continue after determining that those diversions exceeded discretionary authority under its own regulations.

223.    The Corps has thus failed to follow the process mandated by NEPA, the CEQ NEPA regulations, and the Corps' NEPA procedures.

**IX.    THE CORPS HAS ACTED ARBITRARILY AND CAPRICIOUSLY, AND OTHERWISE NOT IN ACCORDANCE WITH THE LAW, AND HAS ABUSED ITS DISCRETION, BY ENTERING INTO ULTRA VIRES CONTRACTS FOR THE DIVERSION OF STORAGE IN THE BUFORD DAM AND RESERVOIR TO MUNICIPAL AND INDUSTRIAL USE.**

224.    The SeFPC repeats the allegations contained in paragraphs 1 through 223 as if fully set forth herein.

225.    As previously established, the Corps has recognized in its own guidelines that contracts for the diversion of storage to water supply can only be executed if there has been: (a) an allocation or reallocation of storage to water supply under the WSA; or (b) a surplus water declaration under the FCA.

226.    No storage in the Buford Dam and Reservoir has been allocated or reallocated to water supply.

227.    There has been no declaration of surplus water in the Buford Dam and Reservoir.

228.    Despite these recognitions, the Corps has executed contracts for the diversion of storage in the Buford Dam and Reservoir to water supply.

229.    Without appropriate crediting to the hydropower purpose, the SeFPC's members have suffered, and will continue to suffer unless remedied by this Court, significant harm due to the Corps' diversion of storage in the Buford Dam and Reservoir to water supply.

230.    The SeFPC has suffered this legal wrong because of Corps actions and failures to act, and is entitled to judicial review under 5 U.S.C. § 702.

231.    The Corps' actions in entering into contracts for the diversion of storage in the Buford Dam and Reservoir to water supply under the IOAA, rather than the WSA or FCA, constitute ultra vires actions that are final and reviewable under 5 U.S.C. § 704.

232.    In failing to properly execute contracts for the diversion of water storage in the Buford Project to water supply under the WSA or FCA, the Corps has unlawfully withheld and unreasonably delayed agency action under 5 U.S.C. § 706(1).

233.    The Corps' actions and failures to act described above are arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without factual or legal substantiation, and should be remedied and set aside under 5 U.S.C. § 706(2).

234.     The SeFPC has exhausted any and all available remedies.

235.     Any and all conditions precedent to the SeFPC's right to bring this claim have occurred or been satisfied.

236.     The Corps' actions and failures to act are unlawful and should be remedied and set aside; and the Corps should be directed to charge only such rates and make only such credits as are in accordance with the law.

X.     **THE CORPS HAS ACTED ARBITRARILY AND CAPRICIOUSLY, AND OTHERWISE NOT IN ACCORDANCE WITH THE LAW, AND HAS ABUSED ITS DISCRETION, BY FAILING TO APPROPRIATELY CREDIT THE HYDROPOWER PURPOSE AS A RESULT OF THE DIVERSION OF STORAGE IN THE BUFORD DAM AND RESERVOIR TO WATER SUPPLY.**

237.     The SeFPC repeats the allegations contained in paragraphs 1 through 236 as if fully set forth herein.

238.     As previously established, the Corps has recognized in its own guidelines that: (a) the appropriate value of M&I water use is the costs of replacement power or value of benefits forgone by hydropower customers; and (b) it is appropriate to credit the hydropower purpose for lost hydropower benefits.

239.     Despite these recognitions, the credits provided by the Corps are less than the amount that hydropower customers must pay for hydropower not generated, and are significantly less than the cost of power necessary to replace the hydropower lost as a result of M&I water diversion.

240.     Further, the Corps has failed to properly develop and adhere to an administrative process, including public notice and comment, that:  (a) considers proposed reallocations of storage in the Buford Dam and Reservoir to M&I use; (b) adopts a method of

tracking withdrawals from storage for M&I use; (c) accounts for related expenses incurred and revenues charged and received; and (d) fully credits the hydropower purpose of all ACF River Basin projects.

241.    In underpricing the water to the M&I users and undercrediting the Southeastern Federal Power Program and, thus, SEPA and the rates charged project customers, the Corps has acted arbitrarily and capriciously, and otherwise not in accordance with the law.

242.    To the extent that the Corps is accorded discretion, it has abused that discretion by failing to properly credit the hydropower purpose under the Corps' own guidelines.

243.    Without appropriate crediting to the hydropower purpose, the SeFPC's members have suffered, and will continue to suffer unless remedied by this Court, significant harm due to the Corps' diversion of storage in the Buford Dam and Reservoir to water supply.

244.    The Corps' actions and failures to act are unlawful and should be remedied and set aside; and the Corps should be directed to charge only such rates and make only such credits as are in accordance with the law.

## **RELIEF REQUESTED**

WHEREFORE, the SeFPC respectfully requests the entry of judgment against the Defendants, and relief for its harm, as follows:

    a.    A declaration that the Congressionally authorized purposes of the Buford Dam and Reservoir are hydropower generation, flood control, and navigation;

b.    A declaration that, absent appropriate crediting to the hydropower purpose, the diversion of storage in Buford Dam to water supply does not meet the seriously-affect-project-purposes prong of the WSA;

c.    A declaration that, absent appropriate crediting to the hydropower purpose, the Corps' shifting of hydropower generation from peak to non-peak time periods to accommodate M&I water use does not meet the major-operational-changes prong of the WSA;

d.    A declaration that there is no surplus water in the Buford Dam and Reservoir, and that thus the diversion of storage in the Buford Dam to water supply does not meet the surplus water provision of the FCA;

e.    A declaration that, absent appropriate crediting to the hydropower purpose, the diversion of storage in the Buford Dam to water supply adversely affects the existing lawful hydropower use of such water and, thus, does not meet the FCA;

f.    A declaration that hydropower customers are not paying the "lowest possible rates" for hydropower in violation of the FCA, unless the Corps properly credits the hydropower purpose;

g.    A declaration that, absent appropriate crediting to the hydropower purpose, any sales of water storage by the Corps for M&I uses from the Buford Project are contrary to the applicable Corps guidelines under the WSA, including USACE ER 1105-2-100, ¶ 3-8b.(5) (Apr. 22, 2000);

h.    A declaration that the current water withdrawals permitted by the Corps for M&I uses from the Buford Project are contrary to the applicable Corps guidelines under the FCA, including USACE ER 1105-2-100, ¶3-8b.(4) (Apr. 22, 2000);

i.    A declaration that the Corps has violated NEPA by failing to subject its actions in diverting storage in the Buford Dam and Reservoir to M&I use and the resulting withdrawals to the scrutiny required by NEPA;

j.    A declaration that the Corps has violated the CEQ's NEPA regulations and the Corps' NEPA procedures in diverting storage in the Buford Dam and Reservoir to M&I use and the resulting withdrawals without subjecting these actions to the scrutiny required by the CEQ's NEPA regulations or the Corps' NEPA procedures;

k.    A declaration that the Corps has acted arbitrarily and capriciously, and otherwise not in accordance with the law, and has abused its discretion, by entering into ultra vires contracts for the diversion of storage in the Buford Dam and Reservoir to M&I use;

l.    A declaration that the Corps has acted arbitrarily and capriciously, and otherwise not in accordance with the law, and has abused its discretion, by failing to appropriately credit the hydropower purpose as a result of the diversion of storage in the Buford Dam and Reservoir to water supply;

m.    A declaration that the prices charged by the Corps for the water withdrawals by M&I users are arbitrary and capricious, an abuse of discretion, not in accordance with the law, and in conflict with the applicable requirements of the Corps' guidelines, USACE ER 1105-2-100, Appendix E, ¶¶ E-57b.(e); E-57d.(2) (Apr. 22, 2000);

n.    A declaration that the Corps' current crediting actions are contrary to its guidelines, as set forth in USACE ER 1105-2-100, Appendix E, ¶ E-57d.(3) (Apr. 22, 2000), and do not protect hydropower customers from being adversely affected by the withdrawals of water or eventual sales of water storage if the Corps persists in its current course;

o.    Injunctive relief (both preliminary and permanent) barring the Corps from charging the M&I users less for the water than the highest of benefits forgone, revenues forgone, the replacement cost, or the updated cost of storage in the Buford Project, as required by Corps guidelines, USACE ER 1105-2-100, Appendix E, ¶¶ E-57b.(3) and E-57d.(2) (Apr. 22, 2000);

p.  Injunctive relief directing the Corps to comply with the provisions of NEPA, the CEQ's NEPA regulations, and the Corps' NEPA procedures with respect to all of its decisions and actions, individually and cumulatively, that result in the present continuous diversions of storage in the Buford Dam and Reservoir to M&I use and the resulting withdrawals, including reasonably foreseeable cumulative impacts and reasonably foreseeable indirect environmental consequences, including but not limited to the environmental impacts attributable to acquisition, through SEPA, of alternative power for the benefit of SeFPC members deprived of hydroelectric power because of diversions of storage to M&I use;

q.  Injunctive relief directing the Corps to develop and adhere to an administrative process, including public notice and comment, that:  (i) considers proposed reallocations of storage in the Buford Dam and Reservoir to M&I use; (ii) adopts a method of tracking withdrawals from storage for M&I use; (iii) accounts for related expenses incurred and revenues charged and received; and (iv) fully credits the hydropower purpose of all ACF River Basin projects;

r.  Injunctive relief in the form of future credits to the hydropower purpose from six years prior to the filing of the SeFPC's original complaint, i.e., December 12, 1994, which is the earliest time permitted by the applicable statute of limitations (28 U.S.C. § 2401(a)), to the present;

s.  An award of pre- and post-judgment interest on the future credits due and owed, as permitted under statute (28 U.S.C. § 1961), principles of equity, and the inherent powers of the Court;

t.  An award to the SeFPC of the costs of this action, including attorneys' fees under 28 U.S.C. § 2412; and

u.  Such other and further relief as the Court deems just and proper.

**[CONTINUATION OF**
*SOUTHEASTERN FEDERAL POWER*
*CUSTOMERS, INC.'S AMENDED COMPLAINT FOR*
<u>*DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF*</u>**]**


Respectfully submitted,


**/s/ Clinton A. Vince**
Clinton A. Vince, Esquire
Orlando E. Vidal, Esquire
Karen A. Sealy, Esquire
Sonnenschein Nath & Rosenthal LLP
1301 K Street, N.W.,
Suite 600, East Tower
Washington, D.C.  20005
Telephone: (202) 408-6400
Fax: (202) 408-6399
Email: cvince@sonnenschein.com
Email: ovidal@sonnenschein.com
Email: ksealy@sonnenschein.com


**COUNSEL FOR PLAINTIFF**
**SOUTHEASTERN FEDERAL POWER**
**CUSTOMERS, INC.**


August 29, 2008

# ATTACHMENT A

## CUSTOMERS WHO RECEIVE POWER FROM GA-AL-SC

**Alabama**

Baldwin County EMC
Black Warrior EMC
Central Alabama EC
Clarke-Washington EMC
Coosa Valley EC
Dixie EC
Pea River EC
Pioneer EC
PowerSouth Energy Cooperative
Tallapoosa River EC
Tombigbee EC
Wiregrass EC

City of Alexander City
City of Dothan
City of Evergreen
City of Fairhope
City of Hartford
City of LaFayette
City of Lanett
City of Luverne
City of Opelika
City of Piedmont
City of Robertsdale
City of Sylacauga
City of Trot
City of Tusckegee

**South Carolina**

Blue Ridge EC
Broad River EC
Laurens EC
Little River EC
York EC
City of Abbeville
City of Easley
City of Gaffney
City of Greenwood
City of Greer

City of Laurens
Town of Prosperity
City of Rock Hill
City of Clinton
Town of Due West
City of Newberry
City of Seneca
City of Union
City of Westminster

**Florida**

Choctawhatchee EC
West Florida Electric Co-op Association
Central Florida EC
Suwannee Valley EC
Talquin EC

Tri-County EC
City of Chattahoochee
City of Quincy

**Georgia**

Altamaha EMC
Amicalola EMC
Canoochee EMC
Carroll EMC
Central Georgia EMC
Coastal EMC
Cobb EMC
Colquitt EMC
Coweta-Fayette EMC
Diverse Power
Excelsior EMC
Flint EMC
Grady EMC
Greystone Power Corp.
Habersham EMC
Hart EMC
Irwin EMC
Jackson EMC
Jefferson EMC
Little Ocmulgee EMC
Middle Georgia EMC
Mitchell EMC
Ocmulgee EMC
Oconee EMC
Okefenoke Rural EMC
Pataula EMC
Planters EMC
Rayle EMC
Satilla Rural EMC
Sawnee EMC
Slash Pine EMC

Snapping Shoals EMC
Southern Rivers Energy
Sumter EMC
Three Notch EMC
Tri-County EMC
Upson EMC
Walton EMC
Washington EMC
City of Acworth
City of Adel
City of Albany
City of Barnesville
City of Blakely
City of Brinson
City of Buford
City of Cairo
City of Calhoun
City of Camilla
City of Cartersville
City of College Park
City of Commerce
City of Covington
City of Dalton
City of Doerun
City of Douglas
City of East Point
City of Elberton
City of Ellaville
City of Fairburn
City of Fitzgerald
City of Forsyth

City of Fort Valley
City of Grantville
City of Griffin
City of Hampton
City of Hogansville
City of Jackson
City of LaFayette
City of LaGrange
City of Lawrenceville
Town of Mansfield
City of Marietta
City of Monroe
City of Monticello
City of Moultrie
City of Newnan
City of Norcross
City of Oxford
City of Palmetto
City of Quitman
City of Sandersville
City of Sylvania
City of Sylvester
City of Thomaston
City of Thomasville
City of Washington
City of West Point
City of Whigham
Crisp County Power
   Commission

## CERTIFICATE OF SERVICE

I certify that on August 29, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System.[151]

/s/ **Orlando E. Vidal**

Orlando E. Vidal, Esquire
Sonnenschein Nath & Rosenthal LLP
1301 K Street, N.W.,
Suite 600, East Tower
Washington, D.C.  20005
Telephone:  (202) 408-6406
Fax:  (202) 408-6399
Email: ovidal@sonnenschein.com

**COUNSEL FOR PLAINTIFF SOUTHEASTERN FEDERAL POWER CUSTOMERS, INC**.

---

[151] Pursuant to the *Second Amended Joint Scheduling Order* issued in the lead docket (3:07-MD-00001) on August 27, 2008, the SeFPC is not required to serve hard copies on other parties in these proceedings, as "service of documents on other parties may be satisfied via electronic distribution to each party's attorney(s) via the CM/ECF system[.]"  *See In re Tri-State Water Rights Litig.*, Second Amended Joint Scheduling Order at 7, Case No. 3:07-md-00001 (issued Aug. 27, 2008).